FIRST NATIONAL BANK OF LA MAR-
QUE, Texas National Bank of Baytown,
First National Bank of Deer Park, First
National Bank of Bellaire, and Madison-
Southern National Bank, Plaintiffs,

v.

James E. SMITH, Comptroller of the Cur-
rency, the State Insurance Board of the
State of Texas and its Members, Joe
Christi, Ned Price and Durwood Man-
ford, Jr., Defendants.

Civ. A. No. 76–G–51.

United States District Court,
S. D. Texas,
Galveston Division.

Aug. 24, 1977.

James Patrick Cooney, Royston, Rayzor, Vickery & Williams, Houston, Tex., for plaintiffs.

William L. Bowers, Jr., Asst. U. S. Atty., Houston, Tex., for defendant.

Thomas M. Pollan, Thomas A. Rutledge, Asst. Attys. Gen., Austin, Tex., for Insurance Board.

## MEMORANDUM OPINION

COWAN, District Judge.

*Issues*:

The judgment of this Court, attached hereto as Exhibit A, itemizes the documentary material presented to the Court and the procedural posture. The key issues are:

1. Is this controversy "ripe" for judicial determination?
2. Has the Comptroller acted unlawfully in demanding that the officers and principal shareholders of plaintiff banks terminate practices relating to credit life and disability insurance which result in diversion of economic benefits rightfully belonging to the banks to "insiders" (i. e., directors, officers, and controlling shareholders)?

The case presents a question of first impression with reference to the handling of credit life insurance by national banks.

*Factual Background*:

Plaintiffs are five national banks located in relatively small communities within the Gulf Coast megapolis. None of the communities in which the plaintiffs conduct their business has fewer than five thousand inhabitants.

There is no evidence presently before the Court that the practices in issue have caused severe economic loss to any of the plaintiffs; the Court presumes (but does not find) that the practices challenged have not caused severe loss to any of the plaintiffs.

There is no evidence before the Court that the plaintiff banks are unsound, insolvent, or unstable. The Court therefore presumes (but does not find) that the practices in question have not materially interfered with the soundness, security or stability of any of plaintiff banks.

There is no evidence presently before the Court that the officers, directors, employees, or controlling shareholders of any of the plaintiff banks have acted in bad faith; and the Court presumes (but does not find) that all actions and positions taken by the officers, employees, and controlling shareholders of plaintiffs have been taken in complete good faith, on advice of counsel, and with no intent to violate fiduciary duties.

This controversy involves economic benefits arising from the placement of credit life and disability insurance (hereinafter "credit life"). Credit life is a transaction whereby a potential borrower consents to pay an amount, in addition to the amount of the borrowing, and the lending institution or other entity makes an arrangement with an insurer whereby if the borrower dies, or becomes disabled, before his loan is repaid, the insurer discharges the loan balance. Credit life, properly used, confers benefits upon the borrower, the bank, and the insurer. On the other hand, there are clearly cases where other security, i. e., other than the credit life, is sufficient so that credit life is unneeded. The placing of credit life presents a significant profit opportunity for all lending institutions. See in this regard the economic facts spelled out in the Texas cases, discussed *infra*.

The exact manner in which the plaintiff banks make arrangements for credit life is spelled out in the affidavit of Mr. Warren Coles. The method is:

During the discussions by which arrangements are made for the extension of credit by the bank, the loan officer explains the functions and availability of credit life insurance to the loan customer. The borrower states whether he wishes or does not wish to receive the benefits of and pay the price for credit life and disability insurance. If the borrower states that he wishes to accept the benefits of and pay the price for credit life, the amount of money which the borrower will be required to pay for this protection is set forth in the disclosure statement, which is initialed by the borrower. Typically, the cost of the credit life insurance is added to the principal of the loan.

The entire credit life transaction is memorialized in a written contract attached to this Opinion as Exhibit B.

This Court assumes that the loan officer complies with the antitrust laws of the United States and Art. 3.53(4) of the Texas Insurance Code. Assuming compliance with those laws, it cannot properly be said that the loan officer "solicits" credit life.

The "paper work" is commendably simple. The entire contractual relationship between the lending institution, the insurer and the debtor is set forth on an easily read, one-page document with clearly legible printing on both sides (see Exhibit B). This document starts off with a brief form entitled "Schedule." The "Schedule" contains the debtor's name, his permanent address, his occupation, his age at his last birthday, the names of the beneficiary in the event credit life in addition to credit disability insurance is obtained, and a statement that the maximum liability under the policy is $25,000. The form also contains blanks in which the person completing the form indicates the type of coverage, the effective date of the insurance, the term in months, the expiration date of the insurance, and the single premium for the term. The "Schedule" also specifies the date upon which disability benefits accrue, and the duration of the benefits in the event of disability, and provide that such disability benefits cannot exceed $350 per month.

The debtor, in executing the "Schedule," also makes certifications concerning health and employment. Typically, this "Schedule" is filled out by a clerical employee of the bank, not the loan officer. The "Schedule" is signed by the insured in certifying his health and medical background.

The most significant aspect of the "Schedule," is its statement that the bank is a *group life policyholder*. The group life policy number is 2127. The plaintiff bank is identified as "*First Beneficiary: (Group Life Policyholder)*."

The "general provisions" of the group policy contain these significant provisions:

1. The document constitutes the entire contract between all parties, i. e., the debtor, the bank (identified as the "Group Life Policyholder"), and the insurer, Allied Bankers Life Insurance Company of Dallas, Texas.

2. Benefits are payable to the "First Beneficiary: (Group Life Policyholder)", (i. e., the bank) for the purpose of extinguishing all unpaid indebtedness and only amounts in excess of such indebtedness are to be paid to the "contingent beneficiary" (i. e., the borrower or his beneficiary).

3. Premiums due insurer are to be paid by the creditor (i. e., the bank). This premium is payable and due to the insurer as of the effective date of the policy.

   The lending institution is both the premium payer and the real beneficiary. It is true that the bank may recover the amount of the premium from the debtor, but the obligation to pay the premium rests upon the bank. The manner in which the bank obtains reimbursement from the debtor is a matter totally between the bank and the debtor.

4. The amount of insurance in force on the life of a particular debtor shall not at any time exceed the debtor's aggregate indebtedness. Thus, under most, if not all, circumstances there would never be a payment of money to a debtor or to his beneficiaries,

since the amount of the insurance never exceeds the debt.

5. With reference to the disability insurance, the policy provides that "the amount of monthly disability benefit provided an insured debtor shall be equal to the initial amount of the insured's indebtedness to the creditor divided by the number of months in the term of the contract, provided however, that such benefits shall never exceed $350 per month . . . ." Again, this provision makes it clear that under most, if not all, circumstances, monetary benefits would not be paid to the debtor.

The activities described in the factual portions of the Coles' affidavit do not place a bank in the insurance business, do not constitute it an ". . . agent for any fire, life or other insurance company . . ." as that phrase is used in 12 U.S.C. § 92 and do not constitute the bank an "insurance agent" as that term is defined in Art. 21.02, Texas Insurance Code. Instead, the bank is properly classified, as the policy itself says, as *"First Beneficiary: (Group Life Policyholder)."*

The Coles' affidavit emphasizes that the amount of time consumed in the clerical work described there is negligible and that the bank has obtained insurance agent licenses for lending officers. Both of these facts are immaterial. The Coles' affidavit also described the loan officer's activities as "solicitation," but this portion of the Coles' affidavit—as will be explained in more detail below—merely expresses a legal conclusion because loan officers cannot properly "solicit" credit life because of the antitrust laws and Art. 3.53, Texas Insurance Code.

The Coles' affidavit also points out that "each loan officer/insurance agent has a contract with the company writing credit life insurance which entitles him to commissions for the sale of credit life insurance." The income accruing by virtue of the contract between the loan officers and the insurance carrier inures not to the banks themselves, but to officers and principal shareholders of plaintiff banks. Plaintiff banks contend that the income generated from the placement of credit life properly inures to the officers of the banks, and not to the banks themselves, because of 12 U.S.C. § 92 as construed in *Saxon v. Georgia Assn of Independent Insurance Agents,* 399 F.2d 1010 (5th Cir. 1968), and *Commissioner v. First Security State Bank of Utah,* 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972).

In January of 1974, the Comptroller, in a letter to the Board of Directors of First National Bank of La Marque, insisted that income generated from the placement of credit life insurance be received by the bank. The Comptroller said:

". . . You should be aware that it is the long-standing policy of this office that, to the extent bank resources and personnel are used to generate this income, (i. e., the income generated from the placement of credit life policies) these funds are the rightful income of the bank and they should be received by the bank. . . ."

After a thorough discussion with his Board of Directors, President Charles R. Vickery, Jr., replied to the Comptroller that the Comptroller's policy as enunciated in the letter of January 17, 1974, was contrary to law enunciated in 12 U.S.C. § 92, *Saxon v. Georgia Assn of Independent Insurance Agents, supra, Commissioner v. First Security State Bank of Utah, supra,* and the Texas Insurance Code. The Comptroller did not retreat from his position, but instead on April 5, 1976, directed to each of the plaintiff banks a letter which precipitated the present suit.

The essence of the Comptroller's letter of April 5, 1976 is:

"The policy of this office is that all credit life insurance income, whether in the form of commissions, experience refunds, or reimbursements for administrative expenses, must ultimately be credited on the banks' books for the benefit of all shareholders. We will not permit a national bank to distribute this income to its officers as a substitute for salary, nor will we allow the income or any portion there-

of to be paid to a director, controlling stockholder(s), partnership or corporation other than a wholly-owned subsidiary of the bank."

The imperative nature of the above-quoted language was softened to some degree in the balance of the letter, wherein the Comptroller acknowledged that ". . . Some lawyers dispute whether a national bank may act as agent for the sale of credit life insurance . . ." The banks were directed to either commence the practice of crediting to the bank all income generated from the sale of credit life, or alternatively, make some other arrangement by which all of the stockholders of the bank would receive their proper share of the economic benefits resulting from the placement of credit life. The thrust of the letter of April 5, 1976 is: "Self-dealing" relating to credit life must stop!

On July 20, 1976, in Volume 41, No. 140 of the Federal Register the Comptroller ·published a proposed rule concerning the disposition of credit life insurance income. This proposed rule is totally consistent with the April 5, 1976 letters. The Comptroller has filed here a copy of the proposed regulation to become effective on January 1, 1978. This proposed regulation is also totally consistent with the thrust of the April 5, 1976 letters.

*Ripeness :*

■ Applying the standards enunciated in *Abbott Laboratories v. John W. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the issue here is ripe for judicial determination. The letters of April 5, 1976 give authoritative interpretations which have a direct effect on the day-to-day business of the plaintiff banks. This Court believes it crystal-clear that plaintiffs were not placed in any real dilemma; however, the Court acknowledges room for a difference of opinion, acknowledges the good faith of the banks' officers, and acknowledges that these "insiders" genuinely felt that they were in a dilemma. Plaintiff banks have commenced to escrow those funds generated by the handling of credit life; this action satisfies the requirement that the challenged administrative policy have an actual impact.

This Court also holds that the questioned practices may well violate 18 U.S.C. § 656, governing misapplication by bank officers of ". . . the moneys, funds or credits of such bank . . ."

In support of the propriety of present judicial review, see also: *National Automatic Laundry & Cleaning Council v. Schultz,* 143 U.S.App.D.C. 274, 443 F.2d 689 (1971); *Independent Bankers Assn of America v. Smith,* 175 U.S.App.D.C. 184, 534 F.2d 921 (1976); *Floersheim v. Engman,* 161 U.S.App.D.C. 30, 494 F.2d 949, 954 (1973); and *Isbrandtsen v. United States,* 211 F.2d 51 (Ct.App.D.C.1954), cert. den. 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124.

*Legality of Comptroller's Policy Determination—Federal Law :*

In any organization more complex than a sole owner-single proprietorship, self-dealing is abhorrent—a poisonous growth which can ultimately destroy any organization if not eliminated root and branch. See: *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.W. 545, and its progeny, wherein courts insist upon the "rule of undivided loyalty." In *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939), the court said:

"A director is a fiduciary . . . so is a dominant or controlling stockholder or group of stockholders. . . . Their powers are powers in trust . . . their dealings with the corporation are subjected to rigorous scrutiny . . ."

In *United States v. Byrum,* 408 U.S. 125, 137–8, 92 S.Ct. 2382, 2391, 33 L.Ed.2d 283 (1972), the Supreme Court said:

"a majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests. . . ."

Self-dealing may hopefully be eliminated—it cannot be controlled. If self-dealing in regard to credit life is acceptable conduct, why isn't self-dealing in other areas respectable? How can bank officers who

themselves engage in self-dealing insist that their employees avoid dishonest practices?

The illegality of self-dealing exists regardless of the financial strength of the plaintiff banks. "Full disclosure" of the practice of all shareholders cannot legitimize this type of self-dealing.

Examination of a hypothetical case may help. Imagine a loan officer employed in a bank in which the income generated from credit life is diverted to the bank president and principal stockholder. A loan officer has the obligation, under law, to make only one inquiry when approving an application for credit: Is this proposed loan a good business transaction for this bank? If the loan officer knows that the president and principal stockholder of the bank (a man who holds life-and-death power over the officer's career) is crucially and personally interested in the income generated from credit life, an entirely new, different and improper set of considerations is inevitably inserted into the loan officer's thinking. Instead of being free to make an unbiased, free determination, the lending officer must inevitably consider the effect upon the principal stockholder. The intolerable situation is further aggravated by the fact that a lending officer who insists upon credit life insurance where the insurance is not really needed, would commit an unconscionable, illegal act, possibly subjecting the bank to possible treble damages under the antitrust laws of the United States, and possible liability for violation of Arts. 3.53 et seq. of the Texas Insurance Code, and Sec. 15.02 et seq. of the Texas Business Commerce Code. See *Fortner Enterprises Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) and Para. 61294 1977–1 CCH Trade cases (Feb. 22, 1977). While this Court renders no opinion concerning the merits of an antitrust action, it could be argued that a lending officer who regularly insisted upon credit life insurance in cases where it was not really needed was illegally tying a desired commodity (i. e., credit) to an undesired commodity (i. e., credit life). As *Fortner* demonstrates, even a non-meritorious antitrust case can result

in possibly ruinous liability for attorney fees and expenses over a decade of litigation.

For more detailed discussion of this potential problem see: *The Tie-in Sale of Credit Insurance in Connection with Small Loans and Other Transactions*, Subcommittee on Antitrust and Monopoly Legislation of the Senate Committee on the Judiciary, 83 Cong. 2d Sess. (1955), reprinted in subsequent hearings on the same subject, Consumer Credit Industry Hearings pursuant to S.Res. 26, before the Subcommittee on Antitrust and Monopoly Legislation of the Senate Committee on the Judiciary, 90 Cong. 1st Sess. (1967), at p. 227.

Plaintiff banks, with commendable candor, refrain from arguing that the opportunity to obtain financial benefits from the placement of credit life is not a corporate opportunity. In the placement of credit life, the bank premises, its good will, its personnel are all employed—but these are not the critical facts. The critical fact is that the lending officer, by virtue of his ability to communicate with the borrower, is the only person anywhere who has a real opportunity to explain the benefits of credit life to a borrower and obtain assent to such insurance. The lending institution is uniquely situated for the placement of credit life. The opportunity to obtain economic advantage from this placement is a unique opportunity of the lending institution.

Established authority reveals that the officers of plaintiff banks subjected themselves to possible stockholders derivative suit by failing to heed the Comptroller's policy directive. See: *Rettig v. Arlington Heights Federal Savings & Loan Assn*, 405 F.Supp. 819 (N.D.Ill1975); *City Federal Savings & Loan Assn v. Crowley*, 393 F.Supp. 644 (E.D.Wis.1975); *Goodman v. Perpetual Building Assn*, 320 F.Supp. 20 (D.C.D.C.1970). This danger is a proper consideration for the Comptroller as well as the banks' officers.

■ An officer, director or controlling owner of any business entity has a fiduciary duty to make certain that the economic

rewards accruing from a corporate opportunity inure to all of the owners of the enterprise. This obligation is even stronger in the case of a bank, both because of the fiduciary nature of banking and because of the duty to depositors. See: *Gadd v. Pearson,* 351 F.Supp. 895, 903 (M.D.Fla.1972) where the court said:

"A director or officer of a banking or other corporation owes a fiduciary obligation to the bank or corporation to exercise the utmost good faith in the exercise of his powers in the interests of the corporation. Equity holds him liable as a trustee to the corporation. . . . Officers and directors of banking corporations generally owe a *greater duty* than other corporate officers and directors. . . ."

Illustrative of the severe standards which courts have imposed upon bank officers or directors who allow themselves to receive economic benefits from the bank in addition to their salaries or fees, is *Fleishhacker v. Blum,* 109 F.2d 543, 545–46 (9th Cir. 1940), where the court said:

"It is a settled principle—applied in its full rigor . . .—that a bank officer who receives a bonus or other consideration for procuring a loan of the bank's funds commits a breach of trust, and that the consideration so paid belongs to the bank and may be recovered by it. See, also, Restatement, Trusts, § 170, Comment n, § 206, Comment k; Restatement, Restitution, § 197, Comment a. The bonus may be recovered even though the bank has suffered no damage (Restatement, Restitution, § 197, Comment c), and even though the officer may have acted in good faith (Restatement, Restitution, § 197, Comment a; . . . ."

This Court must not construe the statutes and cases in such a manner as to permit or encourage corporate insiders to violate their fiduciary obligations. No authority requires (or even suggests) a construction of the applicable statutes which would justify a bank officer's violation of his fiduciary duty. 12 U.S.C. § 92 in its pertinent parts states:

". . . Any such association (i. e., a national banking association organized under the laws of the United States) located and doing business in any place the population of which does not exceed five thousand inhabitants, . . . may, . . . act as the agent for any fire, life, or other insurance company authorized by the authorities of the state in which such bank is located to do business in said state, by soliciting and selling insurance and collecting premiums on policies issued by such company; . . . ."

The statutory language contains no direct prohibition of the activities described in the factual portions of the Coles' affidavit. Such prohibition, if any, must occur merely by implication. Any "implied prohibition" should be strictly construed. Did the Congress really intend, in enacting the statute in 1916 to prohibit banks in communities with over 5,000 inhabitants from obtaining a policy of group credit life insurance and reaping the financial rewards flowing from such a group policy?

This 1916 statute was initially enacted by the Congress at the request of the Comptroller for the purpose of offering a broad source of revenue to small banks in communities under 5,000 in population in order to "place them in a position where they could better compete with local state banks and trust companies. . . ." See Cong.Rec. 11001 (July 14, 1916).

The very few cases construing this statue do not solve this problem.

In *Saxon v. Georgia Assn of Independent Insurance Agents, supra,* the plaintiffs, independent insurance agents attacked the bank's activity in selling "broad forms of automobile, home, casualty and liability insurance." 399 F.2d at 1012. In oral argument here, counsel for plaintiff banks asserts that examination of the record in *Saxon* would reveal that credit life insurance was there involved, but examination of the District Court and Court of Appeals opinions do not reveal that credit life insurance was in any way involved; however, the *key* distinguishing factor here is that *Saxon* did not involve a situation in which the bank

merely obtained a policy in which it was designated "First Beneficiary: (Group Life Policyholder)", paid the premium, and engaged in the essentially clerical activities of enrolling borrowers in the group policy as "insured debtors" or "secondary beneficiaries." In *Saxon,* the bank was seeking to sell insurance and perform all of the customary functions of a general insurance agency.

Comptroller Saxon issued a directive in which he proclaimed that: ". . . national banks have the authority to act as agent in the issuance of insurance which is incident to banking transactions . . ." In the case at bar, the Comptroller has insisted that insiders perform their fiduciary obligation. The challenged bank in *Saxon* was invading those realms of activity which are characteristically carried on by a general insurance agency. Here, the activities in issue do not encroach upon the normal, customary activities of insurance agencies. The material before the Court indicates strongly (though not conclusively) that credit life insurance is not normally available through conventional insurance agencies.

The case of *Commissioner of Internal Revenue v. First Security State Bank of Utah, supra,* cites 12 U.S.C. § 92 but actually *decides* nothing concerning that statute. Additionally, *First Security State Bank of Utah, supra,* does not in any way involve a situation in which a lending institution merely procured a group life policy in which it was designed "First Beneficiary: (Group Life Policyholder)". Justice Powell's opinion in *First Security State Bank of Utah* is based upon an uncontested finding by the tax court that the bank there, upon advice of counsel, "*held the belief* . . ." that it could not, under the circumstances there, receive income generated by customer's purchase of credit insurance.

*Saxon, supra,* and *First Security State Bank of Utah, supra,* are the only cases in 60 years construing 12 U.S.C. § 92. Neither holds that the activities described in the Coles' affidavit render the banks "insurance agencies" or compels the bank officers to violate their fiduciary duties.

The controlling cases here are *Boseman v. Connecticut General Life Insurance Co.,* 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937) and the cases following and applying the principles enunciated therein.

*Boseman* involved a policy of group disability insurance issued to Gulf, the plaintiff's employer. In a controversy between Gulf's employee and the insurer, a determination was necessary as to whether Pennsylvania or Texas law applied. Plaintiff argued that Gulf, his employer, was in effect "an insurance agent," the agent of the insurance carrier, and that therefore Texas law applied. The policy had originally been issued in Pennsylvania to Gulf. The group policy provided that Pennsylvania law applied. Gulf procured the group policy originally, obtained applications from employees, took payroll deduction orders, reported changes in the insured group, paid premiums, obtained new policies, delivered a copy of the certificate of insurance to its employees, forwarded to the insurer the amounts of money deducted from the employee's pay.

In finding that the employer was properly classified as a holder of a group policy, and not as an "insurance agent," the Supreme Court of the United States said:

". . . Employers regard group insurance not only as protection at low cost to their employees, but also advantageous to themselves in that it makes for loyalty, lessens turnover and the like. When procuring the policy, obtaining applications of employees, taking pay roll deduction orders, reporting changes in the insured group, paying premiums, and generally in doing whatever may serve to obtain and keep the insurance in force, employers act *not as agents of the insurer* but for the employees or for themselves . . ." *Boseman, supra,* at 204–05, 57 S.Ct. at 690.

*Boseman* has been consistently followed. See: *Jonas v. Bank of Kodiak,* 162 F.Supp. 751 (D.C.Alaska 1958) (Bank in arranging credit insurance held not to be agent of insurer); *Fidelity & Casualty Co. of N. Y.*

*v. Indiana Lumbermen's Mutual Insurance Co.,* 382 F.2d 839 (5th Cir. 1967) (Automobile lessor who arranged for insurance held agent of the lessee—not agent of the insurance company); *Metropolitan Life Insurance Co. v. Quilty,* 92 F.2d 829 (7th Cir. 1937) (Applying and approving basic principle of *Boseman* ); *Johnson v. Johnson,* 139 F.2d 930 (5th Cir. 1943) (Employer under policy of group insurance is not agent of the insurer and Art. 21.02 of Texas Insurance Code is not applicable); *Aetna Life Insurance Co. v. Messier,* 173 F.Supp. 90 (M.D.Pa.1959) (Boseman applied and approved.)

■ The key question is: What did the Congress mean in 12 U.S.C. § 92 when using the phrase ". . . act as the agent for any fire, life or other insurance company authorized by the authorities of the state in which such bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company; . . .)"? The term "insurance agent" as commonly used, means an entity which actively solicits the sale of insurance of all types, particularly life, casualty, fire and liability policies, counsels actual and prospective clients concerning their insurance needs, arranges coverage of all types, and represents a number of different companies. The activities described by the factual portions of the Coles' affidavit do not resemble the activities normally carried on by an "insurance agent," but on the contrary, are virtually identical to the activities carried on by an employer which obtains and services a policy of group insurance.

Most cases which discuss the meaning of the term "insurance agent" deal with problems entirely different from the problems here in issue. These cases typically involve controversies over whether knowledge or notice in the possession of a particular entity is imputed to the insurer. These cases reveal considerable flexibility in the definition and application of the term "insurance agent." See: *Travelers Indemnity Co. v. National Indemnity Co.,* 292 F.2d 214 (8 Cir. 1961), cases cited *supra* as applying *Bose-*

*man,* and Texas cases discussed *infra.* For some purposes, an "agent" may be regarded as the agent of the insurer, and for other purposes he may be regarded as being the "agent" of the insured. The key to resolution of the problem here is that the banks are properly categorized as *policyholders* —not as "insurance agents." This construction applies, in a straight-forward manner, the categorization which the banks and the insurer adopted when they memorialized Group Policy No. 2127, with the individual bank designated as "First Beneficiary."

*Legality of Comptroller's Action—State Law :*

Art. 3.01 § 9, V.A.T.S. Insurance Code, dealing with life, health and accident insurance provides that:

"Art. 3.01. Terms Defined . . . § 9. The 'single beneficiary' is the person to whom a policy effected is payable."

Applying this definition, the plaintiff banks are, just as they are designated in the policy, *beneficiaries.* Normally an entity cannot be both a "beneficiary" and an "agent."

Art. 3.42 of the Texas Insurance Code requires that any policy of group insurance used in the state by any company shall be filed with the Board of Insurance Commissioners and approved by the Board. This policy, in which the banks are designated as "First Beneficiary: (Group Life Policyholder)", has presumably been approved by the Board of Insurance Commissioners of the State of Texas, who have thereby approved the designation of the banks as *beneficiaries,* not as "agents." Art. 3.42(e) requires the Board of Insurance Commissioners to disapprove if any title or heading contained in a form is misleading.

. Art. 3.50 of the Texas Insurance Code reads:

"Art. 3.50. Group Life Insurance . . . § 1. Definitions: No policy of group life insurance shall be delivered in this State unless it conforms to one of the following descriptions: . . . (4) A policy issued to a creditor, *who shall be*

*deemed the policyholder,* to insure debtors of the creditor, subject to the following requirement . . ."

■ Art. 3.53, particularly Sec. 4, contains vital provisions. When that statutory language is read, it is apparent that a lending institution, and its lending officers, cannot "solicit" credit life as the term "solicit" is commonly used. The lending officer must inform the borrower that the borrower is free to obtain the credit life from any insurer or agent of his own choice, and must avoid coercion. In addition, if arguable antitrust involvement is to be avoided, the lender cannot "tie" undesired insurance to desired credit. See: *Fortner Enterprises v. United States Steel, supra.* Applying these principles, the only thing the lender can do is make a determination as to whether or not credit life will be required as security; and then if it is required, advise the potential borrower that he can procure this insurance through the bank's group policy or from some other source. Such activities are merely proper efforts by lending officers to obtain security for loans, and are not "solicitation" of insurance; thus the lending officers are not "agents" under Art. 21.02 and are not required to be licensed. The fact that plaintiff banks have obtained licenses for lending officers, when they are not legally required to be licensed, does not make them "insurance agents" as that term is used in 12 U.S.C. § 92. In fact, *Guardian Financial Corp of Beaumont v. Rollins,* 312 S.W.2d 553 (Tex.Civ.App.—Beaumont 1958, error ref'd n. r. e.) and *Guardian Consumer Finance Corp. v. Langdeau,* 329 S.W.2d 926 (Tex.Civ.App.—Austin 1959, no writ) hold that where a lending institution causes one of its lending officers to obtain a license to act as an insurance agent, allows this employee to sell credit life insurance, and causes the "agent" to execute an assignment of his "commissions" to the lending institution, such action does not violate the Texas Insurance Code, the assignment is legal, and the lender does not become an "insurance agent."

■ Review of the cases construing Art. 3.53 of the Texas Insurance Code reveals conclusively the legality of the Comptroller's position. In 1949 the 51st Legislature passed a statute which now appears as Art. 3.53 of the Texas Insurance Code. Although the statute itself deals only with credit life on loans of less than $1,000, a study of the cases reveals that it would be most imprudent for any lender to refuse to comply with the basic provisions of this statute in larger loans, for to do so would expose it to antitrust claims under *Fortner, supra,* and to a risk that the amounts of money paid by the borrower for credit life and disability insurance might be included in the interest charges for the purposes of determining whether a loan transaction was usurious. The most significant Texas cases are *Guardian Financial Corp. of Beaumont v. Rollins, supra,* and *Guardian Consumer Finance Corp. v. Langdeau, supra.*

One of the earliest cases construing Art. 3.53, is *Rodriguez v. R. P. Youngberg Finance,* 241 S.W.2d 815 (Tex.Civ.App.—El Paso 1951, no writ history). The *Rodriguez* case, like so many following it, was one in which a disaffected borrower contended that his loan transaction was illegal because moneys paid for credit life were actually money exacted from him as compensation for the use of money, rendering the transaction usurious. In *Rodriguez,* the trial court held as a fact that the conduct of the lender was in good faith, and that the charge for the credit life was not exacted as consideration for the use of money, and thus the plaintiff's case failed; however, it is apparent that if the fact findings had been different, the results would have been different. Most significantly, the Texas court adopted with approval the following language from a Delaware court:

". . . If a lender compel a borrower to insure in a company where the lender will get additional commissions, we think such conduct constitutes an unlawful exaction. If, on the other hand, no compulsion whatever is used, but the selection of the insurance company is made by the borrower and such selection results in an agent's commission to the lender, whether the premium be paid by the borrower

himself or by the lender at the request of the borrower, we see no reason that these commissions should be credited to the borrower. He has no expense in maintaining the agency and has paid but the normal manual rate. There being in this case no evidence of any compulsion in the selection of the company, we do not think the failure to apply the commissions to the account of the borrower constitutes any unlawful charge against the borrower." *Rodriguez, supra* at 820, citing *State v. Bankers Finance Corp.,* 2 Terry 566, 26 A.2d 220.

*Hatridge v. Home Life & Accident Insurance Co.,* 246 S.W.2d 666 (Tex.Civ.App.—Dallas 1951, no writ), like *Rodriguez,* was a suit by a disaffected borrower contending that the amount he paid for credit insurance was exacted from him as part of the consideration for the use of money and that the loan transaction was thus usurious. *Hatridge* involved a frontal attack upon the constitutionality and validity of Art. 3.53. The constitutionality of the statute was upheld. The court confirmed that in a proper case, a plaintiff could successfully allege that moneys paid for credit life insurance would be deemed a part of the consideration for the use of money.

Apparently the first case in which a disaffected borrower succeeded in persuading a court and jury that the amount paid for credit life should be regarded as being compensation for the use of money and that the transaction was thus rendered usurious, is *Ware v. Wright,* 266 S.W.2d 188 (Tex.Civ. App.—Dallas 1954; no writ). The plaintiff there obtained a jury finding that the plaintiff was not given the option to purchase insurance of his own choice, and this finding was held to support a judgment that the amount paid for credit insurance was money exacted for use of money and that the transaction was thus usurious.

*Western Guaranty Loan Co. v. Dean,* 309 S.W.2d 857 (Tex.Civ.App.—Dallas 1957, error ref'd, n. r. e) is another case in which plaintiff urged successfully that amounts of money paid by the borrower for credit insurance were actually moneys exacted for the use of money. Most significant, however, is the fact that the case is direct support for the Comptroller's position that a lender handling credit life is not an "insurance agent." In *Dean,* as here, the lender paid the premium at the time the loan was made, adding the amount of the premium to the debtor's indebtedness. In *Dean,* the borrower defaulted, and the lending institution allegedly engaged in wrongful and harassing collection efforts in an effort to collect the loan, including the amounts added to the loan for credit insurance. The Dallas Court of Civil Appeals held that in making efforts to collect the premium, the lending institution was not acting as an "insurance agent," and on the contrary, the bank was acting only for itself and thus the insurer could not be held liable for the wrongful collection efforts, even though those wrongful collection efforts were directed toward collecting the amount paid to the insurer for furnishing the credit insurance.

· Most of the cases decided under Art. 3.53 involve situations where borrowers fell out with lenders. *Rollins, supra,* was different. Rollins was a manager of a lending institution for a number of years until he was summarily, and in his view, ignominiously discharged. Rollins was licensed as an insurance agent. He handled the placement of credit life for his lending institution. Rollins executed an assignment of the moneys which he received from the insurer for handling the credit life to his employer, the lending institution. The monetary compensation generated by the handling of credit life over the years was considerable, and upon his discharge Rollins sued for those funds, asserting that the assignment to his employer was contrary to the provisions of the Texas Insurance Code, Art. 21.02, et seq. Chief Justice R. L. Murray rejected Rollins' contention as a matter of law, and held that the money generated from the handling of credit life belonged rightfully to the lending institution and that Rollins' assignment was not violative of law. Judge Murray said:

"Under said Article 3.53 a corporation in the loan business is authorized to become a lender agent, to have one of its employees made an insurance agent to write credit life insurance and credit health and accident insurance, and take and retain the commissions on the premiums on such insurance. Subsections D and E of Sec. 1, Art. 3.53, and the definitions included therein appear to make Guardian a *lender* and Rollins a lender agent." *Rollins, supra,* at 561–62.

Applying *Rollins* to the case at bar, the plaintiff banks are not agents; under Texas law, they are *lenders.*

Judge Murray also held that if any conflict existed between Art. 3.53 of the Insurance Code and Art. 21.05, et seq, that Art. 3.53 governed, and that Art. 21.05 et seq, must be construed to be consistent with Art. 3.53. Actually, for our purposes at least, Art. 21.05 and Art. 3.53 are completely consistent because, in truth, neither the plaintiff banks nor their officers are "insurance agents."

Judge Murray's opinion in *Rollins* was followed by Chief Justice Archer of the Austin Court of Civil Appeals in the 1959 case of *Guardian Consumer Finance Corp. v. Langdeau, supra.* Plaintiff in *Langdeau* was the Receiver for Home Life and Accident Insurance Company. Home Life had entered an agreement with Guardian Financial, a lending institution, by which Guardian Financial placed credit life policies issued by Home. Guardian Financial's arrangement with Home provided that Guardian would have its officers licensed under Art. 3.53 as "lender agents." Rather than having the lending officers assign their "commissions" to Guardian, however, Guardian merely retained that portion of the "premium" which it was entitled to retain (which interestingly was 85% of the premium), and remitted the balance to Home Life. Home Life's Receiver contended, just as did *Rollins,* that this arrangement violated Art. 21.05, et seq. of the Texas Insurance Code. The Court of Civil Appeals approved *Rollins,* relying upon *James M. Tardy v. Tarver,* 120 Tex. 591, 39

S.W.2d 848–50, in which the Texas Supreme Court adopted the following language from 2 *Fletcher on Corporations,* Sec. 819, wherein it was stated that:

"It has been held also that while a license cannot issue to a corporation as such, it is competent for the corporation to take out a license in the name of the designated agent or employee, or agents or employees, and the latter may lawfully act in pursuance of the license."

*Langdeau* also reveals that in 1953, the Board of Insurance Commissioners, the statutory agency charged with the enforcement of Texas laws relating to insurance, construed Art. 3.53 as authorizing corporate lenders to retain a portion of the premiums for credit life, health and accident insurance. Judge Archer in *Langdeau* relied upon this construction of the Board of Insurance Commissioners, and pointed out that the Legislature had met in three sessions since that departmental construction and had not amended Art. 3.53, and that therefore the Legislature concurred in that interpretation.

Now, of course, 26 years have elapsed since the Board of Insurance Commissioner's construction.

The position of plaintiff banks is totally inconsistent with Texas law.

*Conclusion :*

The Comptroller here has strongly encouraged the officers of plaintiff banks to adopt practices consistent with their fiduciary obligations. The Comptroller's action is lawful.

### EXHIBIT A

### FULL AND FINAL JUDGMENT

BE IT REMEMBERED that on the 5th day of August, 1977, came on to be heard the Motion for Summary Judgment of the plaintiffs, the Motion to Dismiss of the Comptroller of the Currency, and the Motion to Dismiss on the part of the State of Texas. In support of their motions the parties presented the following material, all of which has been reviewed and considered by the Court:

Plaintiffs' Second Amended Complaint; Affidavit of Charles R. Vickery, Jr., a principal stockholder of each of the plaintiff banks;

The affidavit of Warren Coles, president of First National Bank of Bellaire, and a member of the board of directors of each of the plaintiff banks, and the person who has identified the method by which each of the plaintiff banks has handled credit life insurance during the period of time material to this case;

Affidavit of James Patrick Cooney, identifying voluminous information produced by the Comptroller under the Freedom of Information Act, 5 U.S.C.A. § 552;

Plaintiffs' Motion for Summary Judgment;

Plaintiffs' brief in support of their Motion for Summary Judgment;

Plaintiffs' Supplemental Memorandum in support of their Motion for Summary Judgment;

Plaintiffs' Memorandum in Opposition to Acting Comptroller's Motion to Dismiss;

Answer of Defendant State Board of Insurance, and its Members, containing in Paragraph II a motion to dismiss for failure of plaintiffs' pleadings to state a claim upon which relief can be granted;

Answer of the Comptroller;

Comptroller's Motion to Dismiss:

Memorandum in Support of Comptroller's Motion to Dismiss;

Declaration of Comptroller under oath; Supplemental material filed in connection with defendants' motion for summary judgment, consisting of a proposed regulation of the Comptroller relating to the disposition of credit life insurance income, said proposed regulation to become effective on January 1, 1978, along with the Comptroller's Response to comments elicited pursuant to publication of a proposed rule appearing in the Federal Register on July 20, 1976 at Volume 41, No. 140.

It appearing to the Court on the basis of this material and the oral arguments of counsel that only matters of law are involved in this controversy and that the parties are entitled to a prompt judicial resolution of this matter, the Court enters the following JUDGMENT AND ORDER:

*Comptroller's Motion to Dismiss*

Comptroller has filed a Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. This Motion to Dismiss is OVERRULED, and the Court holds that the controversy presented by the matter before the Court is ripe for judicial determination.

*Motion to Dismiss of State Board of Insurance and its Members*

Paragraph II of the answer of the State Board of Insurance and its Members moves the Court to dismiss this cause of action as to the State Board of Insurance and its Members because of the failure of the plaintiffs' complaint to state a cause of action upon which relief may be granted. Pursuant to the authority granted to this Court by Rule 12(b), Federal Rules of Civil Procedure, the Court treats Paragraph II of the answer of State Board of Insurance and its Members as a motion for summary judgment, and such motion for summary judgment is in all things GRANTED. The Court holds that plaintiffs' second amended complaint does not state a claim upon which any relief can be granted against the State Board of Insurance and its Members.

*Plaintiffs' Motion for Summary Judgment*

The plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part, as specifically set forth herein:

1. Paragraph 1 of plaintiffs' Motion for Summary Judgment prays that this Court declare unlawful the policy directive contained in letters of the Comptroller dated April 5, 1976, declaring that all income whether in the form of commissions, experience refunds, or reimbursements for administrative expenses, resulting from the sale of credit life, accident and health insurance to loan customers of a national bank by any person who is an officer, director,

or stockholder of the national bank, must ultimately be credited on a national bank's books for the benefit of all shareholders. The Court DENIES this portion of the plaintiffs' Motion for Summary Judgment, and instead declares that the action of the Comptroller in demanding that all income, whether in the form of commissions, experience refunds or reimbursements for administrative expenses, resulting from the activities described in the affidavit of Warren Coles is and was a lawful demand by the Comptroller, and the Comptroller has the right, and in fact, the obligation to institute cease and desist proceedings against the plaintiff banks if the practice of diverting such income to directors, officers or controlling stockholders is not immediately terminated.

2. Paragraph 2 of plaintiffs' Motion for Summary Judgment requests the Court to declare that the Comptroller's action, incorporated in his letters dated April 5, 1976, in which the Comptroller asserts that the officers of the plaintiff banks cannot receive income resulting from the banks' customers electing to obtain credit life insurance, is DENIED. On the contrary, the Court declares that the activities described in the Coles affidavit result in the generation of income which properly belongs to the plaintiff banks as institutions, and that the diversion of any of such income to the officers of the bank is a violation of fiduciary duty which the Comptroller is legally entitled to discourage and legally obligated to discourage.

3. Paragraph 3 of plaintiffs' Motion for Summary Judgment demands that the Court declare the Comptroller's policy directive to the effect that credit life insurance income may not be paid to a director, or a controlling stockholder of a national bank, or a corporation or partnership not a subsidiary of a national bank to be unlawful. This paragraph of the plaintiffs' Motion for Summary Judgment is DENIED; and instead, the Court declares that the activities described in the Coles affidavit generate income which properly belongs to the bank, as an independent entity and that any director, officer, or controlling stockholder who diverts such income to himself commits a breach of fiduciary duty which the Comptroller not only may discourage, but is obligated to discourage, initially by persuasion and later by a cease and desist proceeding, if necessary.

4. Plaintiffs in Paragraph 4 of their Motion for Summary Judgment demand that the Court declare unlawful the Comptroller's policy directive that national banks are authorized by 12 U.S.C. § 24(7) to act either in their own right or through an employee as agents for the sale of credit life insurance to loan customers and to receive commission income. This paragraph of the plaintiffs' Motion for Summary Judgment is GRANTED, in part, and the Court declares that 12 U.S.C. § 24(7) does not authorize a national bank to act as an insurance agent, as that term is commonly used; however, the Court declares that the performance of the activities described in the Coles affidavit does not constitute the business of insurance, does not constitute the bank or its employees "agents," as that term is used in 12 U.S.C. § 92, and that the plaintiff banks may perform all of the activities described in the Coles affidavit without becoming insurance "agents," as that term is used in 12 U.S.C. § 92. For this reason, there is no inhibition in law against the plaintiff banks as institutions receiving the full benefit of all income, moneys or other economic benefits generated by virtue of the activities described in the Coles affidavit. For this reason, 12 U.S.C. § 92 cannot be used as justification for officers, directors, or controlling stockholders diverting moneys which belong to the plaintiff banks as institutions to their

own benefit by any strategem or maneuver.

5. In Paragraph 5 of the plaintiffs' Motion for Summary Judgment, plaintiffs request the Court to declare unlawful the Comptroller's policy directive to the effect that a national bank has the right to receive all income derived from the "sale" of credit life insurance to loan customers and that such commission income cannot be received by an individual officer, director or controlling stockholder. The Court DENIES Paragraph 5 of the plaintiffs' Motion for Summary Judgment, and instead declares that the activities described in the Coles affidavit are the exercise of a corporate opportunity and a business opportunity which belongs solely, entirely and exclusively to the plaintiff banks, and that only the banks as institutions have the right to receive the income generated by the activities described by the Coles affidavit.

■ 6. In Paragraph 6 of the plaintiffs' Motion for Summary Judgment, the plaintiffs request the Court to declare unlawful the policy directive of the Comptroller to the effect that directors of a national bank have a fiduciary duty to select an arrangement regarding credit life insurance which does not redound to the personal benefit of a director, officer or principal shareholder. The Court DENIES this paragraph of plaintiffs' Motion for Summary Judgment, and instead declares that directors of a national bank have a strong and compelling fiduciary duty to select an arrangement regarding credit life insurance which does not redound to the personal benefit of a director, officer or principal shareholder, and further declares that directors of national banks have a strong and compelling fiduciary duty to insure that all income or economic benefit of any type arising from the activities set forth in the Coles affidavit accrue solely and entirely to the bank as an institution. If state or federal laws prevent the income or economic benefits generated by the activities described in the Coles affidavit from accruing directly to the bank (and this Court holds they do not), then the directors have a compelling fiduciary duty to make certain that the economic benefits resulting from the activities described in the Coles affidavit redound to the benefit of all stockholders, and not merely directors, officers or principal shareholders.

7. In Paragraph 7 of the plaintiffs' Motion for Summary Judgment, the plaintiffs request the Court to declare unlawful the Comptroller's policy directive to the effect that the plaintiff banks must assure that all income generated by the placing of credit life insurance with the banks' customers be passed to the banks and reflected in their books for the benefit of all stockholders, or alternatively, the banks must secure a group policy providing an experience refund or seek some other arrangement which yields to the banks income they receive.

■ This paragraph of plaintiff's Motion for Summary Judgment is DENIED; instead, the Court declares and holds that the Comptroller's position in this connection is well taken, and that if in fact, federal or state law prevent the income generated from the placement of credit life insurance being passed directly to the bank and reflected in their books for the benefit of their stockholders and depositors, then the Comptroller is legally justified and, in fact, obligated to insist that the bank seek and find some arrangement which insures that all of the stockholders of the bank receive their just share of the economic benefits resulting from the placement of credit life insurance, and the Court finds and declares that viable alternatives in this connection do exist which will enable directors, officers and controlling stockholders of national banks to conform to and comply with their fiduciary duty in this connection.

8. Paragraph 8 of plaintiffs' Motion for Summary Judgment requests the Court to declare unlawful the policy directive of the Comptroller to the effect that income generated from the placement of credit life insurance may not be paid to any officer or director of the First National Bank of La Marque, Texas National Bank of Baytown, First National Bank of Deer Park, First National Bank of Bellaire, and Madison-Southern National Bank or any other person unless this income is passed to the banks as compensation for the use of their premises, personnel and good will. This paragraph of plaintiffs' Motion for Summary Judgment is DENIED; instead, the Court holds and declares that all income generated from the placement of credit life insurance at the banks listed be handled in such manner that such income and economic benefits arising from or connected with the placement of credit life insurance be used for the benefit of all stockholders, and preferably all stockholders and depositors, and that such income or economic benefits generated from the placement of credit life insurance, under no circumstances, be diverted to the personal benefit of any officer, director, principal shareholder or employee of any of the plaintiff banks.

9. In Paragraph I of plaintiffs' Motion for Summary Judgment the plaintiffs request the Court to declare that there is no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law. This paragraph is GRANTED, in part, and the Court holds that there is no genuine issue as to any material fact and that plaintiffs are entitled to a declaratory judgment, and this judgment constitutes such declaratory judgment.

10. In Paragraph II of the plaintiff's Motion for Summary Judgment, the Court is requested to declare that the plaintiffs are precluded from acting as agents in the solicitation and sale of credit life, health and accident insurance, and from receiving commission income in any form from the sale of such insurance under § 92 of Title 12 U.S.C.A. and under Article 12.05 of the Texas Insurance Code. In response to this paragraph, the Court declares that plaintiffs are precluded from acting as general agents for the sale of insurance generally, particularly fire, casualty and life insurance and those forms of insurance customarily handled by insurance agents; however, the Court holds and declares that the activities described in the Coles affidavit do not constitute and make a national bank an insurance "agent," as that term is used in 12 U.S.C.A. § 92; that the activities described in the Coles affidavit do not violate Article 21.05 of the Texas Insurance Code. The Court further holds that if Article 21.05 of the Texas Insurance Code, or any other provision of state law, is so construed as to compel an officer, director or principal shareholder of a national bank to violate his fiduciary duty to his bank, such state law is void and of no force and effect with reference to a national bank. The Court holds, however, that Article 21.05 of the Texas Insurance Code is a valid statute and properly construed does not require any officer, director, principal shareholder or employee of a national bank to violate his fiduciary duty to the bank.

11. In Count II of the plaintiffs' Second Amended Complaint, plaintiffs allege that their constitutional rights under the Fifth Amendment are being violated, that they are being subjected to discriminatory enforcement and deprived of their rights in violation of the due process clause of the Fifth Amendment. Plaintiffs seek injunctive relief pursuant to 28 U.S.C. § 1331 to stop this alleged discriminatory harassment. On the basis of the material submitted attached to the affidavit of James Patrick Cooney, counsel for plaintiff banks, the Court holds that the plain-

tiffs have not been subjected to discriminatory enforcement and that their constitutional rights have not been violated, that the allegations of Count II of the Second Amended Complaint are not valid, and plaintiffs request for injunctive relief is DENIED.

Costs are assessed against the plaintiffs, for which let execution issue in the event same are not seasonably paid.

## EXHIBIT B

☐ Check If Agricultural, Horticultural or Educational Loan

**SCHEDULE — INSURED S COPY**

No. GC 1500869

| INSURED DEBTOR L'ST | FIRST | MIDD ₹ INITIAL) | PERMANENT ADDRESS NO. STREET | CITY | | ZIP CODE | OCCUPATION | AGE · LAST BIRTHDAY |
|---|---|---|---|---|---|---|---|---|

☐ YES  ☐ NO
JOINT LIFE

| NAME OF SECOND PARTY IF JOINT LIFE | RELATIONSHIP IF JOINT LIFE | OCCUPATION | AGE · LAST BIRTHDAY |
|---|---|---|---|

GROUP LIFE POLICY NUMBER **2127**

FIRST BENEFICIARY: (GROUP LIFE POLICYHOLDER)
**FIRST NATIONAL BANK**
**BELLAIRE, TEXAS**

SECONDARY BENEFICIARY    DEBTOR'S ESTATE ☐
OR
NAME & RELATIONSHIP

| COMPANY'S MAXIMUM LIABILITY ACCORDING TO AGE GROUP: | | TYPE OF COVERAGES | EFFECTIVE DATE OF INSURANCE | TERM IN MONTHS | EXPIRATION DATE OF INSURANCE | INITIAL AMOUNT OF INSURANCE | MONTHLY REDUCTION AND/OR BENEFIT | SINGLE PREMIUM FOR TERM |
|---|---|---|---|---|---|---|---|---|
| DEBTOR'S AGE GROUP | MAXIMUM LIABILITY | 1 LEVEL TERM LIFE | | | | | | |
| **15-65** | **25,000** | 2. DECREASING TERM LIFE | | | | $ | | $ |
| | | | | | | $ | $ | $ |
| Term cannot extend beyond 71st birthday | | 3. DISABILITY BENEFIT COMMENCES AS OF THE____DAY OF SUCH DISABILITY PROVIDED DISABILITY HAS EXISTED CONTINUOUSLY FOR ____ DAYS. | | | | $ (NOT TO EXCEED $350.00 PER MONTH) CANNOT EXTEND BEYOND AGE 65 | $ | $ |

I hereby certify that I am not being treated, nor have I been treated for any disease or disorder of the heart, the liver, stroke, high blood pressure, tuberculosis, emphysema, ulcers, paralysis, urinary or kidney disorder, cancer, diabetes, and to the best of my knowledge and belief I am in good health as of the above effective date. I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company or other organization, institution or person, that has any records or knowledge of me or my health, to give to the Allied Bankers Life Insurance Company any such information, and waive all provisions of law forbidding disclosures of such information. A photographic copy of this authorization shall be as valid as the original.

I am ☐ am not ☐ gainfully presently employed. (check one)
(Must be employed to apply for disability)

Signature of the Insured ___X_____x

Signature of the Insured _____x
(Signature of Second Party If Joint Life)

### ALLIED BANKERS LIFE INSURANCE COMPANY — DALLAS, TEXAS
*(herein called the Company)*

In consideration of the premium and the representation of good health and gainful employment, as shown above, hereby insures the person/persons named above as Insured Debtors for the benefits under the Plan or Plans for which premiums are specified in the Schedule above (but none other), subject to all of the terms, conditions and provisions of this Policy.

### GENERAL PROVISIONS

1 POLICY CONTRACT. This Policy and the application therefor, a copy of which appears above and is hereby made a part of this Policy, shall constitute the entire contract between the parties hereto. No condition, provision or privilege of this Policy can be waived or modified in any case except by an endorsement hereon made at the Home Office of the Company by the President, a Vice President, the Secretary or an Assistant Secretary of the Company. No agent has power on behalf of the Company to waive, change or modify any of the terms or conditions of this Policy, or to bind the Company by making any promise or by making or receiving any representation or information.

2. BENEFICIARY. Benefits payable under this Policy shall be paid to the First Beneficiary, designated as the Creditor Beneficiary in the Schedule above, to reduce or extinguish the unpaid indebtedness of the Debtor to the Creditor, except that any amount due in excess of such indebtedness shall be paid to the Contingent Beneficiary named in the Schedule above. Such excess shall be paid by separate check of the Company

3 PAYMENTS OF PREMIUMS. The premiums due the Company for any credit life or credit disability insurance coverage provided in this Policy shall be paid by the Creditor, either from the Creditor's funds or from charges collected from the Insured Debtor, or both The Single Premium charge shall be the Single Premium for the amount, term and Plan or Plans of insurance coverage specified in the Schedule above, said premium being due and payable to the Company at its Home Office in Dallas, Texas, as of the effective date of this Policy.

4. TERM OF INSURANCE. This Policy shall take effect as of the effective date stated in the Schedule above and shall continue in force during the term specified in said Schedule until the expiration date of insurance shown therein, provided, however, that the expiration date for the specified insurance shall not extend more than fifteen (15) days beyond the scheduled maturity date of the indebtedness involved in the credit transaction.

5. TERMINATIONS AND REFUNDS (1) The insurance in force as specified in the Schedule of this Policy shall be terminated if the Debtor's indebtedness to the Creditor is discharged due to prepayment, renewal or refinancing prior to the scheduled maturity date or is transferred to another Debtor or is charged off by the laws applicable to the Creditor or becomes in default and the collateral is repossessed by the Creditor. In the case of termination of credit life insurance by death of the Insured Debtor, the life insurance premium paid or then due and payable to the Company is deemed earned and no refund thereof shall be made but in such instance, the premium for accident and health insurance shall not be deemed earned and the same shall be refunded under the formula hereinafter provided. Any termination of the insurance coverage shall be without prejudice to any claim originating prior to such termination and if a disability claim is in progress at the time of the discharge of the indebtedness by prepayment, renewal or refinancing, such claim shall continue as if there had been no such prepayment, renewal or refinancing. (2) In all cases of termination prior to the scheduled maturity date of this Policy, the Debtor shall be paid or credited with a refund computed by the "Sum of the Digits" formula for decreasing term life and accident and health premiums and on a pro rata basis for the level term premiums and for premiums paid on a monthly balance basis. A premium refund or credit will not be made if the amount thereof is less than One Dollar ($1.00).

6. MISSTATEMENT OF AGE The age of the Insured Debtor, whenever referred to herein, is the age last birthday. If the age of any Insured Debtor is misstated, the amount of benefits payable under this Policy shall be the amount of insurance coverage determined by the true age of the Insured Debtor.

7. ASSIGNMENT OF POLICY OR BENEFITS. Neither this Policy nor any insurance benefits provided hereunder is assignable.

B CONFORMITY WITH STATE STATUTES. Any provision of this Policy which, on its effective date, is in conflict with the statutes of the state in which the insured resides on such date is hereby amended to conform to the minimum requirement of such statutes.

### PROVISIONS APPLICABLE TO LIFE INSURANCE

1. BENEFITS. The Company hereby agrees that immediately upon receipt at its Home Office of due proof of the death of the Insured Debtor, named in the Schedule above, occurring during the term of this Policy and while this Policy is in force, it will pay the amount of life insurance in force at the time of the death of the Insured under the following Plans-

PLAN 1. LEVEL TERM LIFE INSURANCE The amount of insurance is the Initial Amount of Insurance specified in the Schedule above.

PLAN 2. DECREASING TERM LIFE INSURANCE. The amount of insurance in force beginning on the Effective Date of this Policy shall be the Initial Amount of Insurance specified in the Schedule above On the corresponding day of each succeeding month thereafter, during the term for which this Policy is written, the amount of insurance in force shall decrease by the amount of the Monthly Reduction specified in the Schedule above.

2. PERSONS AND LOSSES NOT COVERED UNDER LIFE BENEFITS. No Debtor is eligible for credit life insurance under this Policy where it purports to

A Insure the life of the Debtor named herein prior to his fifteenth (15th) birthday; or

B. Extend the life insurance on the Debtor named herein beyond his seventy-first (71st) birthday, or

C. Grant life insurance coverage on the Debtor named herein after he has reached his seventy-first (71st) birthday; or

D. Initially insure the life of the Debtor named herein at any time subsequent to the date the indebtedness is incurred; or

E Extend coverage to Guarantors or Endorsers of another's obligation, or

F. Extend life insurance coverage on the Debtor named herein (1) beyond a term of one-hundred forty-four (144) months if the Debtor's age falls in the age group of 15-65, or (2) beyond a term of sixty (60) months if the Debtor's age falls in the age group of 66-70. (No term shall extend life insurance coverage beyond the 71st birthday as provided in section B above.)

Form 1003 (3.44) (3 53) 6-75

**842**

3. INCONTESTABILITY. This Policy, in so far as Li.....surance coverage is concerned, shall be incontestabl.....r two years from its effective date, except for non-payment of the Single Premium due on the effective.....e of this Policy. All statements made by or on behalf.....he Insured Debtor, shall in the absence of 1 a d be deemed representations and not warranties No such statement shall void the Policy or be used as a defense to a claim hereunder unless such statement is contained in the application on page one

4. SUICIDE. If the Insured Debtor shall die by his intentional act (that is, by suicide) while sane or insane, within two years from the effective date of this Policy, the liability of the Company shall be limited to an amount equal to the life insurance premiums actually paid under this Policy.

5. RESERVE BASIS. The reserve on this Policy shall be based on the Commissioners 1958 Standard Ordinary Mortality Table with interest at the rate of three per cent per annum; but in no event shall such reserve be less than that required by the laws of the State in which this Policy is delivered. _ _ _

6. MAXIMUM LIABILITY. The amount of insurance in force on the life of the Insured Debtor shall not at any time exceed the smaller of: (A.) $25,000, or (B.) Such Insured Debtor's aggregate amount of indebtedness to the Creditor as evidenced in this and all other Policies and Certificate of Insurance issued to the Debtor by the Creditor at the time the indebtedness is incurred, or (C.) The Company's maximum liability on all Policies and Certificates of Insurance issued and outstanding at any time on the life of the Insured Debtor as determined by the age of such Debtor, which is specified in "Company's Maximum Liability According to Age Group" shown in the schedule of page one of the policy.

## PROVISIONS APPLICABLE TO DISABILITY INSURANCE

1. TOTAL DISABILITY DEFINED. "Total Disability" during the first twelve (12) months of any continuous period of disability means complete incapacity of the insured to perform any of the duties of his occupation, business or employment, which he held at the commencement of such disability and, for the remainder of any such period of continuous disability, "Total Disability" means complete incapacity of the insured to perform any of the duties of any occupation for which he is reasonably fitted by education, training or experience. Bodily injury as used herein, means bodily injury, not elsewhere excepted herein occurring after the effective date of the insurance shown in this policy, which causes the loss directly and independently of all other causes and which causes loss of time commencing while the insurance is in force as to the Debtor whose injury is the basis of the claim. Sickness, as used herein, means sickness or disease, not elsewhere excepted herein, contracted and commencing after the effective date of the insurance provided in this policy, which sickness or disease is the basis of the claim and which causes loss of time commencing while the insurance is in force as to such Debtor.

2. BENEFITS INSURED. In the event of the continuous and total disability of the Insured Debtor, the Company will pay a monthly disability benefit provided for in the Schedule of this Policy. The amount of Monthly Disability Benefit provided an Insured Debtor shall be equal to the initial amount of the Insured's indebtedness to the Creditor divided by number of months in the term of the contract, provided, however, that such benefit shall never exceed $350.00 per month. The Company shall make such payments hereunder during the term of total and continuous disability or during the unexpired term of this Policy, whichever is the shorter period.

3. PAYMENTS OF BENEFITS Upon receipt of due notice and proof in writing on forms furnished by the Company that the Insured Debtor has become totally disabled and is entitled to disability benefits under the terms of this Policy, the Company will pay the monthly indemnity specified in the Schedule of this Policy under the plan for which a premium is shown but NOT more than one indemnity will be paid for any loss resulting concurrently from an accident and illness. When such proof of loss is received by the Company, it will pay the benefits due for each day of such disability, which shall be calculated as 1/30th of the Monthly Disability Benefit shown in the Schedule of this Policy in accordance with one of the following Plans:

    I. Non-Retroactive Plans:

        (a) Beginning with the thirty-first (31st) day of such disability, provided such disability has existed continuously for thirty (30) days; or

        (b) Beginning with the fifteenth (15th) day of such disability, provided such disability has existed continuously for fourteen (14) days; or

    II. Retroactive Plans:

        (a) Beginning with the first (1st) day of such disability, provided such disability has existed continuously for thirty (30) days; or

        (b) Beginning with the first (1st) day of such disability, provided such disability has existed continuously for fourteen (14) days, or

        (c) Beginning with the first (1st) day of such disability, provided such disability has existed continuously for seven (7) days,

whichever has been specified in the Schedule of this Policy and for which premiums have been paid Such accrued benefits shall be paid to the Creditor each month to reduce or extinguish the Insured Debtor's unpaid indebtedness, during any period for which the Company is liable, and if the indemnities exceed the unpaid indebtedness, such excess shall be paid to the Insured, if living, otherwise to a beneficiary other than the Creditor, named by the Debtor or his Estate.

4. TIME LIMIT ON CERTAIN DEFENSES. After 2 years from the effective date of this Policy no misstatements, except fraudulent misstatements, made by the applicant in the application for this Policy shall be used to void the Policy or to deny a claim for disability (as defined in this Policy) commencing after the expiration of such 2 year period No claim for disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specified description effective on the date of loss has existed prior to the effective date of coverage of this policy.

5. NOTICE OF CLAIM. Written notice of claim must be given to the Company within twenty (20) days after the occurrence or commencement of any loss, or as soon thereafter as is reasonably possible. Notice given by or in behalf of the insured or the beneficiary to the Company at its Home Office at Dallas, Texas, or to any authorized agent of the Company, with information sufficient to identify the Insured Debtor, shall be deemed notice to the Company.

6 CLAIM FORMS The Company, upon receipt of a notice of claim, will furnish to the claimant such forms as are usually furnished by it for filing proofs of loss. If such forms are not furnished within fifteen (15) days after the giving of such notice, the claimant shall be deemed to have complied with the requirements of this Policy as to proof of loss upon submitting, within the time fixed in this Policy for filing proofs of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made

7 PROOFS OF LOSS Written proof of loss of time on account of disability for which claim is made must be furnished to the Company at its Home Office within ninety (90) days after the termination of the period for which the Company is liable Failure to furnish such proof of loss within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible; and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required

8. ATTENDING PHYSICIAN AND PHYSICAL EXAMINATIONS. Disability shall be computed from the first call of a physician and indemnity hereunder shall be payable only for the period the Insured Debtor is regularly attended by a licensed physician, other than himself. The Company at its own expense shall have the right and opportunity to examine the person of the Insured Debtor when and as often as it may reasonably require during the pendency of a claim hereunder.

9. TIME OF PAYMENT OF CLAIMS. Subject to due written proof of loss, all accrued indemnities for loss for disability will be made monthly and any balance remaining unpaid upon the termination of liability will be paid immediately upon receipt of due written proof, provided, however, that not more than one indemnity provided in this Policy shall be paid for any loss of time resulting concurrently from accident and sickness.

10. LEGAL ACTIONS. No action at low or in equity shall be brought to recover the disability benefits provided in this Policy prior to the expiration of sixty (60) days after written proof of loss has been furnished in accordance with the requirements of this Policy No such action shall be brought after the expiration of three (3) years after the time written proof of loss is required to be furnished.

11. OTHER INSURANCE IN THE COMPANY The Monthly Disability Benefit allowed by the Company to any Insured Debtor shall never exceed $350.00. If the Debtor is insured under one or more Individual Credit Life and Disability Policies with the Company or if the same Debtor is also insured under one or more Group Life and Disability Certificates with the Company, and said Policies and Certificates be in force concurrently, making the aggregate indemnity for loss of time on account of the total disability of such Debtor in excess of $350.00 per month, the excess insurance shall be void and all premiums paid for such excess shall be refunded to the Creditor Beneficiary named in the Schedule above, to be credited or paid to the Insured Debtor

12. PERSONS AND LOSSES NOT COVERED UNDER DISABILITY BENEFITS. The Disability Benefits provided in this Policy do not cover any loss of time when such disability results from any of the following:

    A An accident incurred or an illness or disease existing prior to the effective date of this Policy and for any such condition the insured Debtor received medical diagnosis or treatment within six months preceding the effective date of the Debtor's coverage and which caused loss within six months following the effective date of the Debtor's coverage.

    B. Pregnancy, childbirth or miscarriage.

    C. Intentionally self-inflicted injuries.

    D. An accident incurred or disease contracted in any country other than the United States, Canada or Mexico.

    E. Service in any branch of the Armed Forces of any country at war

    F. Any person who has not reached his fifteenth (15th) birthday or to any Debtor after he has reached his sixty-sixth (66th) birthday; or

    G. Any person who is unable to affirmatively sign the statement of gainful employment listed on the reverse side hereof at the time this policy was issued.

    H. Where coverage is placed on a person other than the First Insured Debtor named in the Schedule.

IN WITNESS WHEREOF, Allied Bankers Life Insurance Company has caused this Policy to be executed at its Home Office at Dallas, Texas.

_Betty Richardson_
Secretary

_R L Edens_
President

Registrar