**FIRST NATIONAL BANK OF LAMARQUE et al., Plaintiffs-Appellants,**

v.

**James E. SMITH, Comptroller of the Currency, Defendant-Appellee,**

**State Insurance Board of the State of Texas et al., Defendants-Appellants.**

No. 77-2804.

United States Court of Appeals, Fifth Circuit.

Feb. 1, 1980.

---

William L. Bowers, Jr., Sp. Asst. U. S. Atty., Houston, Tex., Ford Barrett, Asst. Chief Counsel, Comptroller of the Currency, James V. Elliott, Atty., Thomas P. Vartanian, Washington, D. C., for defendant-appellee.

Before GOLDBERG, FAY and ANDERSON, Circuit Judges.

FAY, Circuit Judge:

In this action for declaratory judgment, five national banks in Texas question the authority of the Comptroller of the Currency to issue certain letter directives pertaining to credit life and disability insurance. The contested letters prohibit the banks from distributing credit life insurance income to bank officers, directors, controlling stockholders, or any other "insiders". Holding that the letter directives are a valid exercise of the Comptroller's authority under 12 U.S.C. § 1818(b) (1976), we affirm in part and vacate in part the judgment and memorandum opinion of the district court in *First National Bank of La Marque v. Smith*, 436 F.Supp. 824 (S.D.Tex.1977).

## I. FACTS

The five appellant banks[1] are national banking associations organized under the National Bank Act, 12 U.S.C. § 21 et seq. (1976). Each of the banks has followed a similar practice in making credit life, health and accident insurance (hereinafter "credit life") available to its loan customers.[2] A

James Patrick Cooney, E. D. Vickery, Houston, Tex., Thomas Pollan, Asst. Atty. Gen., Austin, Tex., for plaintiffs-appellants.

1. Appellant banks are First National Bank of La Marque, Texas National Bank of Baytown, First National Bank of Deer Park, First National Bank of Bellaire, and Madison-Southern National Bank. First National Bank of Deer Park, now known as the First Bank of Deer Park, has surrendered its federal charter and is currently chartered under Texas state law. Counsel for the appellant banks stated at oral argument that First National Bank of Deer Park was no longer an appellant and no longer had an interest in the controversy because it was no longer

a national bank. We disagree with this contention because this controversy pertains to a period of time during which First National Bank of Deer Park was chartered as a national bank and subject to all national bank policies. Furthermore, we are unaware of any formal withdrawal or dismissal of Deer Park from the case.

2. Credit life is a transaction whereby a potential borrower consents to pay an amount, in addition to the amount of the borrowing, and the lending institution or other entity makes an arrangement with an insurer whereby if

bank loan officer who is also an insurance agent licensed by the Texas State Board of Insurance informs the customer of the availability of credit life insurance. If the customer desires to obtain credit life coverage, an entry is made on a loan disclosure form; the customer initials the form and signs an application. The insurance premium may either be added to the loan principal or paid by the customer when the loan is made. Once the loan transaction is completed, a bank clerical employee completes the policy schedule and mails the policy to the customer. The premium is placed in a trust account. At the close of each month a report is prepared and furnished to the insurance company, along with copies of all policy schedules for the coverage written that month and the portions of the premiums payable to the insurer. The portions of the premiums which constitute agents' commissions are transferred to an account maintained in the name of a designated agent. The designated agent is then responsible for the distribution of the commission income to each agent contractually entitled to receive it. Each loan officer/insurance agent has a contract with the credit life insurance company which entitles him to commissions for the sale of credit life insurance. The income accruing under the contract between the loan officers and the insurance carrier inures not to the banks themselves, but to the bank's officers and principal shareholders.

In April, 1976 appellee Comptroller of the Currency sent a letter[3] to each of the appellant banks stating:

> The policy of this Office is that all credit life insurance income, whether in the form of commissions, experience refunds or reimbursement for administrative expenses, must ultimately be credited on the bank's books for the benefit of all shareholders. We will not permit a national bank to distribute this income to its officers as a substitute for salary, nor will we allow the income or any portion thereof to be paid to a director, controlling stockholder(s), partnership or corporation other than a wholly owned subsidiary of the bank.

The imperative nature of this language was softened in the balance of the letter. The Comptroller acknowledged that

> some lawyers dispute whether a national bank may act as agent for the sale of credit life insurance and receive commission income. Even if a national bank is not so authorized, the board of directors may not distribute the income to persons or entities other than the bank. Rather, the board and its members have a fiduciary obligation to investigate alternative methods of selling credit life insurance which will yield income to the bank that it can legally receive.

The letter suggested several alternative arrangements for the sale of credit life which would enable all of the bank's stockholders to receive their proper share of the economic benefits resulting from the placement of credit life. The letter then stated that failure of the bank's board of directors to make such alternative arrangements would constitute a violation of fiduciary duty and might result in the commission of an unsafe and unsound banking practice warranting supervisory action by the Comptroller.[4]

---

the borrower dies, or becomes disabled, before his loan is repaid, the insurer discharges the loan balance. Credit life, properly used, confers benefits upon the borrower, the bank, and the insurer. On the other hand, there are clearly cases where other security, i. e., other than the credit life, is sufficient so that credit life is unneeded. The placing of credit life presents a significant profit opportunity for all lending institutions.

*First National Bank of La Marque v. Smith*, 436 F.Supp. 824, 826. The district judge's memorandum opinion sets forth in detail the exact manner in which the appellant banks make arrangements for credit life. *See id.* at 826–28.

3. The substantially identical letters received by the banks were dated April 5, 1976. The letters were directed to the President or Chairman of the Board of each bank, and they were signed by H. Joe Selby, First Deputy Comptroller for Operations of the Office of the Comptroller.

4. The "threatening" portion of the letter stated:
   In short, there are alternative arrangements which can be made if the bank believes it may neither act as agent in its own right or through an employee for the sale of credit life insurance, nor receive commission income. A board of directors that fails to select one of these alternatives over another arrangement which redounds to the personal

The thrust of the Comptroller's letter was clear: " 'self-dealing' relating to credit life must stop!" *First National Bank of La Marque v. Smith*, 436 F.Supp. 824, 829 (S.D. Tex.1977).

Shortly after receiving the Comptroller's letter directive, appellant banks brought this action for declaratory judgment, naming as defendants both the Comptroller of the Currency and the Texas State Board of Insurance.[5] The banks alleged that the Comptroller's directive required them to take credit life insurance commissions into income. This practice, they argued, was in direct conflict with recent constructions of 12 U.S.C. § 92[6] prohibiting the receipt of

---

benefit of directors, officers or principal shareholders, has violated its fiduciary duty under both the common law and 12 U.S.C. 73. As a result, consenting board members may be held liable in their personal capacity. Moreover, a board which diverts credit life income to persons or entities other than the bank has committed an unsafe and unsound banking practice which could warrant affirmative supervisory action by this Office.

In light of the above, we request the bank to assure that all credit life commissions presently payable to bank employees, directors, principal stockholders or any other party be passed to the bank and reflected on its books for the benefit of all stockholders. Alternatively, the bank must secure a group policy providing an experience refund, or seek some other arrangement which yields to the bank income it can receive. In the event the bank selects the group policy-experience refund alternative, the policy may be obtained directly from the underwriter or from an independent licensed agent, provided the latter is not also a holder of 5% or more of the bank's shares. Under no circumstances may income of any kind be paid to you, or any companies controlled by you, or any other person unless this income is passed to the bank as compensation for the use of its premises, personnel and good will. We will not request the board or you to reimburse the bank for credit life income diverted from the bank in the past years. However, this does not absolve the board from civil liability to shareholders for its failure to investigate alternative methods of selling credit life insurance which would have eliminated the present conflict of interest and self-dealing. To mitigate the board's exposure to civil damages for breach of fiduciary duty, we suggest that the board take quick action to terminate the present arrangements. The board's failure to do so may result in further administrative action by this Office, including a cease and desist order.

5. Defendant-appellant State Board of Insurance answered the banks' complaint with a motion to dismiss the Board and its members because of the banks' failure to state a claim upon which relief could be granted. The district court granted the motion and dismissed the State Board of Insurance. The Board has nevertheless filed a notice of appeal, claiming that the district court erroneously interpreted state and federal law so as to severely limit the

state of Texas' ability to regulate the insurance business and protect the public from insurance abuse. The narrow scope of our decision in this case makes it unnecessary for us to interpret or apply Texas insurance law, and we vacate the decision of the district court to the extent that it determines questions of state law.

6. 12 U.S.C. § 92 provides:

In addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which such bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company; and may receive for services so rendered such fees or commissions as may be agreed upon between the said association and the insurance company for which it may act as agent; and may also act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located, receiving for such services a reasonable fee or commission: *Provided, however*, That no such bank shall in any case guarantee either the principal or interest of any such loans or assume or guarantee the payment of any premium on insurance policies issued through its agency by its principal: *And provided further*, That the bank shall not guarantee the truth of any statement made by an assured in filing his application for insurance.

The statute was enacted by Act of Sept. 7, 1916, Ch. 461, 39 Stat. 753. The U.S.Code beginning in 1952 has omitted 12 U.S.C. § 92 on the ground that it was repealed in 1918. *See*, 12 U.S.C. § 92 (1976). There has been considerable discussion as to whether the Code was correct in doing so. The issue appears to be resolved by the decisions in *Saxon v. Georgia Ass'n of Independent Ins. Agents*, 399 F.2d 1010, 1013 (5th Cir. 1968) (court's ruling based on its finding that the 1916 amendment "is now Section 92 of the Act"), *Commissioner v. Morris Trust*, 367 F.2d 794, 795 n.3 (4th Cir. 1966)

insurance commissions by national banks. *See Saxon v. Georgia Ass'n of Independent Insurance Agents*, 399 F.2d 1010, 1013 (5th Cir. 1968) ("national banks have no power to act as insurance agents in cities of over 5,000 population"); *accord, Commissioner v. First Security Bank of Utah*, 405 U.S. 394, 401, 92 S.Ct. 1085, 1090, 31 L.Ed.2d 318 (1972) (national bank "could never have received a share of the [credit life insurance] premiums"). After a hearing on motions by the parties, the district court issued its full and final judgment, followed by a memorandum opinion. *First National Bank of La Marque v. Smith*, 436 F.Supp. 824 (S.D.Tex.1977). The court first determined that the conflict was ripe for adjudication. It then upheld the Comptroller's directive requiring appellant banks to seek an arrangement for providing credit life without conferring personal benefits on insiders. The court declared that credit life insurance income properly belongs to the banks as institutions, and that the diversion of such income to directors, officers, or controlling shareholders, i. e., "insiders," constitutes a breach of fiduciary duty which the Comptroller "is obligated to discourage, initially by persuasion and later by a cease and desist proceeding, if necessary." *Id.* at 838.

The court resolved the apparent conflict between the Comptroller's letter and 12 U.S.C. § 92 by determining that the handling of credit life by the banks does not constitute the bank or its employees "agents" as that term is used in section 92. As a result, the court found that section 92 did not prevent the banks from receiving the full benefit of all income, moneys or other economic benefits generated by credit life sales. Although the district court's opinion suggests that the banks are required to take credit life commissions into income, the requirement is not absolute. The court noted that "[i]f state or federal laws prevent the income or economic benefits generated by [credit life sales] from accruing directly to the bank (and this Court holds they do not), then the directors

have a compelling fiduciary duty to make certain that the economic benefits . . . redound to the benefit of all stockholders, and not merely directors, officers or principal shareholders." *Id.* at 839.

We affirm the judgment of the district court insofar as it upholds the Comptroller's letter directives as a reasonable exercise of the Comptroller's authority to supervise national banks. Because the Comptroller's directive does not require the banks to sell credit life insurance or take commissions into income it is unnecessary to determine whether such activities are permissible under 12 U.S.C. § 92. We therefore vacate those parts of the opinion pertaining to section 92. We also vacate the district court's decision to the extent that it determines questions of Texas insurance law, since such a determination is not required for resolution of this controversy. *See infra.*

## II. THE MOOTNESS ISSUE

In September, 1977, one month after appellants filed a notice of appeal in this case, the Comptroller adopted a regulation dealing with the handling of credit life insurance commission income by national banks. 42 Fed.Reg. 48518–48526 (1977). The regulation, which became effective January 1, 1978, prohibits employees, officers, directors and principal shareholders of national banks from benefitting personally on the sale of credit life insurance to loan customers. The regulation authorizes, but does not require, national banks to receive all income generated from the sale of credit life insurance. 12 C.F.R. §§ 2.1–2.7 (1979).

█ The Comptroller argues that the appeal in this case is mooted by the adoption of the new regulation, which requires essentially the same results as the controverted letter directive. Because the new regulation supersedes the Comptroller's informal directive and appellant banks are presumed to be complying with it, the Comptroller contends that no reason exists to continue

(court took position that the provision was still in force, in spite of the Code), and in *Commissioner v. First Security Bank of Utah*, 405 U.S. 394, 401 n.12, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972) (court's decision based on assumption

that section 92 was still in force even though recognizing that the revisions of the Code have not included the section in recent editions). Under these circumstances, further discussion of the issue seems moot.

debating the validity of the prior directive. We disagree. Although the new regulation supersedes the prior directive, it did not take effect until January 1, 1978, and it does not apply retroactively. 42 Fed.Reg. 48518 (1977). The Comptroller's letter directive was thus in force from the date of its issuance—April 5, 1976—until January 1, 1978. Consequently, any credit life commissions generated during that time period are subject to the policies set forth in the letter directive. The promulgation of 12 C.F.R. Part 2 clearly limits the scope of this case but it certainly does not moot it.

## III. THE COMPTROLLER'S DIRECTIVE, 12 U.S.C. § 92, AND THE TEXAS INSURANCE CODE

The district court declared in its full and final judgment that the sale of credit life insurance is "the exercise of a corporate opportunity and a business opportunity which belongs solely, entirely and exclusively to the plaintiff banks, and . . . only the banks as institutions have the right to receive the income generated by [such sales]". *First National Bank of La Marque v. Smith*, 436 F.Supp. 824, 839 (S.D.Tex. 1977). The banks contend that section 92 of the National Bank Act and various provisions of the Texas Insurance Code prohibit national banks from acting as insurance agents or from receiving insurance related income. Because of this prohibition, the banks assert that, contrary to the Comptroller's directive, they cannot function as agents in the sale of credit life insurance or receive any income generated from the sale of such insurance.

We find it unnecessary to determine in this case whether the banks may act as insurance agents or take credit life insur-

ance commissions into income. Neither the Comptroller's letter directive nor the district court judgment require such action by the banks. Admittedly there is language in the Comptroller's letter stating that "all credit life insurance income . . . must ultimately be credited on the bank's books for the benefit of all shareholders." The remaining portions of the letter, however, make it clear that the thrust of the Comptroller's directive is to eliminate "self-dealing" by prohibiting distribution of credit life income to bank officers, directors, and controlling shareholders. The letters sent to the appellants expressly state that "alternative arrangements . . . can be made if the bank believes it may neither act as agent in its own right or through an employee for the sale of credit life insurance, nor receive commission income." Because the banks are not being required to act as insurance agents or to receive credit life income, we need not decide whether such activity would be permissible under 12 U.S.C. § 92 or the Texas Insurance Code.[7] We therefore vacate those portions of the district court decision which interpret section 92 and Texas insurance law to permit appellants to handle credit life transactions.

## IV. THE AUTHORITY OF THE COMPTROLLER

Appellants assert the Comptroller has no authority to issue a substantive directive regarding the handling of credit life insurance by a national bank. We disagree. The Comptroller has not acted arbitrarily or capriciously, or abused his discretion in this case. *See* 5 U.S.C. § 706(2) (1976). The letter directives sent to the appellant banks constitute a lawful exercise of the Comp-

---

**7.** This area of overlapping state and federal regulation requires the striking of a delicate balance. National banks are instrumentalities of the federal government, created for a public purpose, and as such are necessarily subject to the paramount authority of the United States. *Smith v. Witherow*, 102 F.2d 638, 641 (3d Cir. 1939). At the same time, the regulation of the insurance industry is a matter of state law, and no act of Congress may be construed to invalidate, impair or supersede any state law enacted for the purpose of regulating the business of insurance unless such act specifically relates to

the business of insurance. McCarran-Ferguson Act, 15 U.S.C. §§ 1011, 1012 (1976). We note that a national bank is subject to state law as long as the state law doesn't interfere with the purposes of the bank's creation, does not destroy its efficiency, and does not conflict with some paramount federal law. *Lewis v. Fidelity and Deposit Co.*, 292 U.S. 559, 566, 54 S.Ct. 848, 78 L.Ed. 1425 (1934). However, our interpretation of the Comptroller's controverted directive eliminates the need for us to resolve any potential conflicts between state insurance law and federal banking law in this case.

troller's authority to prevent national banks from engaging in unsafe and unsound banking practices under 12 U.S.C. § 1818(b) (1976).[8]

■ The Office of the Comptroller of the Currency is a bureau of the United States Treasury Department charged with the supervision and regulation of national banking associations. 12 U.S.C. § 1 et seq. (1976). Under the provisions of 12 U.S.C. § 481 (1976) the Comptroller is required to examine each national bank periodically and to take appropriate corrective action to maintain the bank's safety and soundness. Congress has conferred broad statutory powers on the Comptroller to enable him to perform his supervisory and regulatory functions. There are statutory provisions dealing with virtually every aspect of supervising the national banking system, from the Comptroller's authority to charter a new national bank to his broad discretion in declaring a national bank insolvent. *See* 12 U.S.C. §§ 21, 191 (1976). The Comptroller is given the power to recommend the suspension or removal of a bank officer or director for committing unsafe and unsound practices, as well as the power to issue temporary and final cease and desist orders. 12 U.S.C. § 1818(b), (c), (e) (1976). The Comptroller has wide discretion in the field of national banking and the exercise of his discretion will not be disturbed except when the exercise is arbitrary, capricious or contrary to law. *Ramapo Bank v. Camp*, 425 F.2d 333, 341 (3rd Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970).

The letter directives in this case were issued by the Comptroller pursuant to his authority under section 1818(b)(1) to issue and serve upon a bank a notice of charges if, "in the opinion of the appropriate Federal banking agency, any insured bank . . is engaging . . . in an unsafe or unsound practice in conducting the business of such bank." 12 U.S.C. § 1818(b)(1) (1976). Appellant banks agree that section 1818(b) sets forth a statutory procedure for dealing with unsafe and unsound banking practices, but they assert that "[n]owhere . . . is there a grant of authority to issue regulations defining 'unsafe and unsound practices.'" Reply Brief of Appellants at 6. This assertion is inapposite, since the Comptroller has not in this case issued a regulation defining an unsafe and unsound practice. The Comptroller's letter is merely a statement of his informed, expert, and well-reasoned opinion about the practice of some banks and of his intention to exercise his clear statutory authority to initiate cease and desist actions to stop the practice. *Cf. Independent Bankers Ass'n of America v. Heimann*, Civ. No. 77–2189 (D.C. Cir., filed Dec. 23, 1977).[9]

---

**8.** 12 U.S.C. § 1818(b) (1976) in part provides:

**(b) Cease-and-desist proceedings**

(1) If, in the opinion of the appropriate Federal banking agency, any insured bank or bank which has insured deposits is engaging or has engaged, or the agency has reasonable cause to believe that the bank is about to engage, in an unsafe or unsound practice in conducting the business of such bank, or is violating or has violated, or the agency has reasonable cause to believe that the bank is about to violate, a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank, or any written agreement entered into with the agency, the agency may issue and serve upon the bank a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the bank.

Section 1818(b) was amended in 1978 to permit financial institution regulatory agencies to institute cease-and-desist proceedings against individuals as well as institutions. *See* 12 U.S.C.A. § 1818(b) (1979 Pocket Part); 1978 U.S. Code Cong. & Admin.News, pp. 9273, 9290.

**9.** The *Independent Bankers* case presents a challenge to the validity of 12 C.F.R. Part 2, the regulation which supersedes the letter directives *sub judice.* Shortly before the regulation became effective, the Independent Bankers Ass'n of America (I.B.A.A.) filed suit in the United States District Court for the District of Columbia challenging the regulation's validity as a binding regulation with the force of law. The I.B.A.A. contended that the rulemaking procedure was flawed, and alleged that the regulation was unreasonable and contrary to law. The district court denied the I.B.A.A.'s motion for a temporary restraining order and following a hearing on the merits, dismissed the complaint. Plaintiff I.B.A.A. has filed an

The Comptroller has neither exceeded his authority nor acted unreasonably in determining that the distribution of credit life insurance commissions to bank "insiders" constitutes an unsafe or unsound banking practice. "The phrase 'unsafe or unsound banking practice' is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies." *Groos National Bank v. Comptroller of the Currency*, 573 F.2d 889, 897 (5th Cir. 1978); *see First National Bank of Eden v. Department of the Treasury*, 568 F.2d 610, 611 n.2 (8th Cir. 1978) (Comptroller suggesting that "unsafe and unsound banking practices" encompass what may be generally viewed as conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder.). The district court's memorandum opinion amply illustrates the "unsafe or unsound" character of the banks' practices with respect to credit life income. *See First National Bank of La Marque v. Smith*, 436 F.Supp. 824, 829–31 (S.D.Tex.1977). The payment to and retention by loan officers of commissions derived from the sale of credit life insurance involves an inherent conflict of interest: the loan officer's judgment may be influenced by his direct financial reward from making the loan. As a result, the officer may be induced to make a loan he would not otherwise have considered sound. When loan officers are allowed to retain commissions, the prospect of personal financial gain is interjected into the lending decision. A similar situation can arise when the commissions are paid to a bank's president or principal shareholder, since the loan officer's judgment may still be tainted by his awareness of who will receive the commissions and what may happen if commissions are not forthcoming. *See id.* at 830. Clearly the Comptroller's concern with appellants' credit life practices is not unwarranted. As Congress has noted, "[p]roblem banks and insider abuses have been virtually synonomous [sic]. Nothing appears more often on the fever charts of sick financial institutions than self-dealing ailments." 1978 U.S.Code & Cong. Admin.News, pp. 9273, 9282.

■ The retention of credit life insurance commissions by national bank insiders is an appropriate subject of concern to a bank regulatory agency. We therefore hold that the Comptroller's informal directives to appellant banks were a proper exercise of his authority under 12 U.S.C. § 1818(b).

### V. CONCLUSION

We affirm the judgment of the district court insofar as it upholds the Comptroller's letter directives as a reasonable exercise of the Comptroller's authority to supervise national banks. In effect, the directives require that if the banks wish to provide credit life insurance coverage, they must do so without conferring a personal benefit on bank officers, directors and principal shareholders. Since the directives represent an attempt by the Comptroller to minimize conflicts of interest, self-dealing, and unsafe and unsound banking practices among national banks, they are within the Comptroller's authority.

Because the Comptroller's directive does not require the banks to act as agents for the sale of credit life insurance and receive commission income, we need not determine whether such activities are permissible under federal banking laws or the Texas Insurance Code. We therefore vacate those portions of the district court's opinion which construe 12 U.S.C. § 92 and Texas insurance law to permit sales of credit life insurance by national banks.

appeal. *Independent Bankers Ass'n of America v. Heimann*, No. 78–2199 (D.C. Cir.) (oral argument on October 23, 1979).

While the I.B.A.A. suit also involves the disposition of credit life insurance income, it differs from the appeal now before this court.

The I.B.A.A. suit challenges the validity of a formal regulation promulgated after notice and public comment. *See* 42 Fed.Reg. 48518 (1977). In contrast, this action challenges the validity of informal directives from the Comptroller's office to the five appellant banks.

Paragraphs 1, 2, 3, 5, 6, 7, 8, 9, and 11 of the district court's full and final judgment are affirmed. Paragraphs 4 and 10 of the judgment are vacated.

AFFIRMED IN PART AND VACATED IN PART.