# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-1979

———————

| | | |
|---|---|---|
| Damian Sinclair, individually and as assignee of Sinclair National Bank, | * * * | |
| Plaintiffs - Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | Western District of Arkansas. |
| John D. Hawke, Jr., et al., | * * * | |
| Defendants - Appellees. | * | |

———————

Submitted: September 9, 2002

Filed: January 3, 2003

———————

Before LOKEN, FAGG, and RILEY, Circuit Judges.

———————

LOKEN, Circuit Judge.

Exercising his comprehensive authority to regulate national banks, the Comptroller of the Currency declared Sinclair National Bank (SNB) insolvent and appointed the Federal Deposit Insurance Corporation (FDIC) as SNB's receiver under the national banking laws. See 12 U.S.C. §§ 191, 1821(c)(2)(A)(ii). SNB and its owner, Damian Sinclair, sued the Comptroller in his official capacity, the FDIC, and certain employees of the Office of the Comptroller of the Currency (OCC) seeking

an order removing the FDIC as receiver and other equitable relief. The district court[1] denied plaintiffs' motion for a temporary restraining order, and the FDIC sold the assets of SNB to another Arkansas bank.

Mr. Sinclair, acting individually and as assignee of SNB, then filed an amended complaint, dropping the agency defendants and the claims for equitable relief and asserting damage claims against the Comptroller and eight other OCC employees, in their individual capacities, for violating the First and Fifth Amendments; two federal civil rights laws, 42 U.S.C. §§ 1981 and 1982; and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). The district court granted defendants' motion to dismiss, concluding that District Deputy Comptroller John Bodnar is entitled to qualified immunity regarding his action in approving Mr. Sinclair's change-of-control application, and that all defendants are entitled to absolute immunity regarding the other regulatory actions challenged in the amended complaint. Mr. Sinclair appeals the court's absolute immunity ruling. Concluding that the amended complaint fails to state a claim upon which relief can be granted, we affirm without reaching the absolute immunity issue. See Abels v. Farmers Commodities Corp., 259 F.3d 910, 916 (8th Cir. 2001) (standard of review).

## I. Background.

In 1999, Northwest National Bank was a distressed bank operating in Gravette, Arkansas, under a Memorandum of Understanding with the OCC. Mr. Sinclair filed a change-in-control application with the OCC, stating his intent to purchase the bank and submitting a business plan in which the bank would purchase large pools of non-prime consumer loans to low-income borrowers from Stevens Financial Group, Inc., a company formerly owned by Mr. Sinclair. The OCC approved the change of

---

[1]The Honorable ROBERT T. DAWSON, United States District Judge for the Western District of Arkansas.

ownership provided the bank would maintain enhanced capital ratios. In March 2000, Mr. Sinclair agreed to that condition, purchased the bank for $2.75 million, changed the bank's name to SNB, and contributed an additional $2 million to the bank's capital. The District Deputy Comptroller primarily responsible for oversight of SNB immediately received a letter from the FDIC criticizing the OCC for approving the change in ownership without considering the FDIC's negative comments regarding Mr. Sinclair's business plan. Thus began a contentious two-year regulatory relationship during which, the amended complaint alleges, OCC officials took the following actions against SNB:

• In April 2000, OCC began "a persistent series of directives and criticisms, each of increasing severity, none of which was based on a comprehensive examination of the actual loan files." A May 17 OCC letter alleged that the bulk loans purchased by SNB violated the legal lending limit.

• On June 28, 2000, the OCC issued a Safety and Soundness Notice of Deficiency criticizing SNB's management and monitoring of its non-prime loans and containing "numerous contrived and specious allegations." The statute authorizes the OCC to commence cease-and-desist proceedings if "in the opinion of" the agency, a national bank "is engaging or has engaged . . . in an unsafe or unsound practice." 18 U.S.C. § 1818(b)(1). The Comptroller's regulations authorize the OCC to issue a Notice of Deficiency to request a compliance plan. See 12 C.F.R. § 30.3(b).[2]

• In September 2000, OCC officials demanded that SNB limit non-prime minority and low-income loans to one-hundred percent of the bank's capital. OCC

---

[2]Congress did not define unsafe and unsound banking practices in the statute. "[T]he Comptroller suggests that these terms encompass . . . conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder." First Nat'l Bank of Eden v. Dept. of the Treasury, 568 F.2d 610, 611 n.2 (8th Cir. 1978).

threatened to issue a safety and soundness order if SNB did not comply. Because this "patently punitive demand" would leave SNB unable to implement its business plan, SNB sued the OCC in the United States Court of Federal Claims for breach of an alleged contract defining the capital requirements OCC would impose. SNB also sued various OCC officials in the District of Columbia District Court, asserting the constitutional violations alleged in this lawsuit and seeking declaratory and injunctive relief from the threatened regulatory action.[3]

• The OCC conducted two lengthy on-site examinations of SNB in late 2000 and early 2001 that "totally paralyzed SNB's activities by virtue of the [examiners'] constant and deliberate interference." The National Bank Act authorizes the Comptroller to "appoint examiners who shall examine every national bank as often as the Comptroller . . . shall deem necessary." 12 U.S.C. § 481.

• In December 2000, the OCC concluded that SNB's proposed compliance plan was inadequate and issued a Notice of Intent to Issue a Safety and Soundness Order, a regulatory action authorized by 12 C.F.R. § 30.5(a). In response, SNB submitted another compliance plan. In March 2001, the OCC criticized that plan and imposed "restrictions on non-prime lending that made it impossible for SNB to carry out the business plan that the OCC had expressly approved just one year earlier."

• In April 2001, the OCC issued a Cease and Desist Consent Order. When SNB refused to consent, the agency issued a Notice of Charges on June 7, 2001, as

_____

[3]On February 27, 2001, the District of Columbia District Court denied SNB's emergency motion to stay regulatory action, concluding that the bank was unlikely to prevail in the litigation. SNB dismissed this lawsuit one month later, allegedly because Mr. Bodnar told Mr. Sinclair that the OCC would not approve SNB's compliance plan with the action pending. The Court of Claims action was not dismissed. See Sinclair v. United States, 49 Fed. Cl. 274 (2001) (denying the OCC's motion to dismiss). The record on appeal does not disclose the status of that action.

authorized by 12 U.S.C. § 1818(b)(1). SNB answered the Charges, and an administrative law judge set a discovery schedule.

• In early August 2001, the OCC reclassified SNB's loan portfolio, declared SNB "critically undercapitalized," and issued a Prompt Corrective Action Directive requiring SNB to submit a capital restoration plan and take other corrective actions, a directive authorized by statute, see 12 U.S.C. § 1831*o*(e)(2) & (i), and by the Comptroller's regulations, which provide for a prompt administrative appeal, see 12 C.F.R. § 6.21(a)(2). SNB filed a capital restoration plan and an administrative appeal. In addition, the Chapter 11 trustee for Stevens Financial Group submitted a change-of-control application to the OCC, seeking to purchase SNB from Mr. Sinclair for $2 million. When the OCC denied SNB's request for a hearing and more time to respond, SNB and Mr. Sinclair filed their initial Petition for Review of Agency Action and Complaint in the district court. After a telephonic hearing the next day, the district court denied plaintiffs' motion for a temporary restraining order.

• In early September 2001, the OCC declared SNB insolvent, appointed the FDIC as SNB's statutory receiver, and terminated the pending administrative proceeding as moot. See 12 U.S.C. §§ 191, 1821(c)(2)(A)(ii). The district court declined to enjoin the receivership, the FDIC sold SNB's assets to another bank, and Mr. Sinclair alleges he lost the ability to recover his investment in SNB.

After setting forth the above-summarized dispute in great detail, the amended complaint asserts the following compensatory and punitive damages claims on behalf of Mr. Sinclair personally and as SNB's assignee:

1. Fifth Amendment equal protection and procedural and substantive due process claims under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971), alleging that the OCC officials took the above

regulatory actions for retaliatory and vindictive purposes and to discriminate against minority borrowers.

2. First Amendment Bivens claims alleging that, beginning in December 2000, all the OCC regulatory actions were taken in retaliation for SNB's exercise of its First Amendment right to file the two lawsuits SNB filed that fall.

3. Claims of race discrimination under 42 U.S.C. §§ 1981 and 1982. In support of these claims, the amended complaint alleges that various OCC officials made statements over the course of the two-year dispute evidencing their hostility toward minority borrowers, statements of the kind we have called "stray remarks" in the more familiar context of employment discrimination disputes.

4. RICO claims alleging that defendants "conspired to fraudulently approve the charter for SNB and then institute a program of regulatory action to force SNB to abandon its non-prime lending programs" as part of a pattern of racketeering activity "designed to deprive minorities from having ownership of significant national banks and to prevent minority and low-income borrowers from having access to credit."

By these claims, Mr. Sinclair seeks to have a jury decide whether defendants' facially lawful regulatory actions were the product of an unlawful motive. To our knowledge, such judicial review of the actions of federal bank regulators would be unprecedented. The issue, broadly stated, is whether Congress has authorized wide-ranging judicial review of regulators' motives in personal damage actions that might have a chilling effect on their willingness to aggressively attack unsafe and unsound banking practices.

## II. The Constitutional and Civil Rights Act Claims.

A. Mr. Sinclair's Individual Claims. The amended complaint alleges that Mr. Sinclair was sole shareholder and chairman of the board of SNB and "was damaged in his business or property" by defendants' alleged unlawful regulatory conduct. The pleading is defective for failing to allege Mr. Sinclair's constitutional and prudential standing to assert these claims. His only financial injury was to the value of his investment in SNB resulting from adverse actions taken against SNB. Thus, Mr. Sinclair "falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." Warth v. Seldin, 422 U.S. 490, 509 (1975).

In Potthoff v. Morin, 245 F.3d 710, 716 (8th Cir. 2001), we dismissed a sole shareholder's First Amendment claim for lack of standing, applying the longstanding principle that "[a]ctions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock" (quotation omitted). Accord Gregory v. Mitchell, 634 F.2d 199, 202 (5th Cir. 1981) (dismissing bank shareholders' equal protection and due process claims against the FDIC and state regulators); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 16 (1st Cir. 1979) (dismissing developer's § 1981 claim against local regulator). Here, too, Mr. Sinclair's indirect monetary loss simply does not give him constitutional or statutory standing to sue the OCC defendants for their regulatory actions against SNB.

B. SNB's Bivens Claims. In Bivens, the Supreme Court held that private citizens have a cause of action for damages against federal agents who violate their Fourth Amendment rights. The Court has since declined to extend this nonstatutory damages remedy to contexts in which it may be inferred that Congress has spoken to the contrary. For example, in Bush v. Lucas, 462 U.S. 367, 368 (1983), the Court

held that the elaborate and comprehensive statutory remedies available under the civil service system precluded a <u>Bivens</u> damage action by a federal employee who was allegedly disciplined for exercising his First Amendment rights. In <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 414 (1988), the Court held that Social Security claimants may not sue government officials under <u>Bivens</u> for alleged due process violations in denying or delaying benefits. And in <u>FDIC v. Meyer</u>, 510 U.S. 471, 473 (1994), and <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 63 (2001), the Court refused to extend <u>Bivens</u> to claims against federal agencies and private government contractors, as opposed to individual federal officials. The issue in this case is whether to extend <u>Bivens</u> to Mr. Sinclair's claims for damages against OCC officials for their adverse regulatory actions against SNB.[4]

In <u>Chilicky</u>, 487 U.S. at 423, the Supreme Court stated that a "special factor" precluding a <u>Bivens</u> action is the existence of a statutorily created remedy, even if that remedy does not provide complete relief:

> When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional <u>Bivens</u> remedies.

We have described this limitation as creating -

> a sort of presumption against judicial recognition of direct actions for violations of the Constitution by federal officials. . . . If Congress has not explicitly created such a right of action, and if it has created other remedies to vindicate (though less completely) the particular rights

---

[4]SNB assigned its claims to Mr. Sinclair after the FDIC was appointed SNB's receiver. Defendants argue that the assigned claims must be dismissed because only the FDIC as receiver has standing to assert them on behalf of SNB. <u>See</u> 12 U.S.C. §§ 91, 1821(d)(2)(A)(i). We need not consider this issue.

being asserted . . . [then only] if Congress's omission to recognize a constitutional tort claim was "inadvertent" will the courts be free to allow such a claim.

McIntosh v. Turner, 861 F.2d 524, 526 (8th Cir. 1988). When Congress has created a comprehensive regulatory regime, the existence of a right to judicial review under the Administrative Procedure Act is sufficient to preclude a Bivens action. See Miller v. U.S. Dep't of Agric. Farm Servs. Agency, 143 F.3d 1413, 1416 (11th Cir. 1998); Maxey v. Kadrovach, 890 F.2d 73, 75-76 (8th Cir. 1989). "[P]arties may not avoid administrative review simply by fashioning their attack on an [agency] decision as a constitutional tort claim against individual [agency] officers." Zephyr Aviation, L.L.C. v. Dailey, 247 F.3d 565, 572 (5th Cir. 2001).

Congress has been establishing and extensively regulating national banks for over two hundred years. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401-02 (1819). Since the nineteenth century, the designated federal regulator (now, the Comptroller of the Currency) has had broad powers to conduct bank examinations and to declare national banks insolvent. See 12 U.S.C. §§ 161, 191, and their predecessor statutes. Today, the OCC's extensive oversight powers include approving applications for new national bank charters, for the grant of additional corporate powers, and for changes in the ownership of existing banks; issuing cease and desist orders and prompt corrective action notices to curb unsafe and unsound banking practices; assessing civil money penalties; and appointing conservators and receivers to take over distressed and insolvent banks. See 18 U.S.C. §§ 21, 27, 30, 36, 191, 203, 1818, 1831*o*; First Nat'l Bank of LaMarque v. Smith, 610 F.2d 1258, 1264-65 (5th Cir. 1980). Through periodic examinations and intense regulation of unsound practices, the OCC actively engages with bank management to protect the interest of depositors and the general public in the solvency and soundness of national banks. As Judge Posner observed in Central Nat'l Bank of Mattoon v. U.S. Dept. of Treasury, 912 F.2d 897, 905 (7th Cir. 1990), "Those banks are [the Comptroller's] wards, and his only wards; if they fail in droves, he will be blamed." The FDIC

-9-

exercises extensive complementary powers, such as insuring national bank deposits and serving as the statutory receiver for insolvent national banks.

In 1966, Congress enacted the Financial Institutions Supervisory Act, Pub. L. 89-695, 80 Stat. 1028 (1966), granting the Comptroller and other federal bank regulators broad powers to issue cease and desist orders and orders suspending and removing unfit bank officers -

> in order to prevent violations of law or regulation and unsafe and unsound practices which otherwise might adversely affect the Nation's financial institutions, with resulting harmful consequences to the growth and development of the Nation's economy.

S. Rep. No. 1482 (1966), reprinted in 1966-3 U.S.C.C.A.N. 3532, 3533. Exercise of these new remedial powers was subject to carefully circumscribed APA review. See 12 U.S.C. § 1818(h) (judicial review of cease and desist and suspension and removal orders is limited to APA review and "shall be exclusively as provided in this subsection (h)"); 12 U.S.C. § 1818(g)(3) (barring pre-enforcement review of some suspension orders; upheld against a procedural due process challenge in FDIC v. Mallen, 486 U.S. 230, 245 (1988)); 12 U.S.C. § 1818(i)(1) (courts have no jurisdiction to enjoin enforcement actions; applied in Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc., 502 U.S. 32 (1991)); 12 U.S.C. §§ 1818(c)(2) and 1818(e)(3) (limited judicial authority to stay or enjoin temporary cease-and-desist orders and some suspension and prohibition orders).

When these new regulatory powers were enacted in 1966, the Comptroller already possessed the most drastic regulatory power -- the authority to declare a national bank insolvent and appoint a statutory receiver or conservator. See 12 U.S.C. § 191, a section of the often-amended National Bank Act. Section 191 permits the Comptroller to appoint the FDIC receiver "without prior notice or hearings." While § 203(b) provides for judicial review of a Comptroller order appointing the

-10-

FDIC as conservator, the National Bank Act is silent as to whether an order appointing the FDIC as receiver is subject to judicial review. Because of the highly discretionary nature of the decision, and the need for prompt action to protect depositors when a bank becomes insolvent, federal courts have divided on this issue. See James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1092-93 (D.C. Cir. 1996); American Bank, N.A. v. Clarke, 933 F.2d 899, 903-04 (10th Cir. 1991); In re Matter of Liquidation of Amer. City Bank & Trust Co., 402 F. Supp. 1229, 1231 (E.D. Wis. 1975) (collecting cases). But many courts have dismissed damage actions against the OCC for wrongfully appointing the FDIC as receiver on the ground that this is a discretionary act exempt under the Federal Tort Claims Act. See FDIC v. Irwin, 916 F.2d 1051, 1053-54 (5th Cir. 1990); Golden Pac. Bancorp v. Clarke, 837 F.2d 509, 512 (D.C. Cir. 1988); Huntington Towers, Ltd. v. Franklin Nat'l Bank, 559 F.2d 863, 868-70 (2d Cir. 1977).

In 1989, faced with a nationwide crisis in the savings and loan industry, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. No. 101-73, 103 Stat. 183 (1989). Convinced that inadequate enforcement powers and regulatory laxity were contributing factors to the failure of many thrift institutions, Congress granted expanded and strengthened enforcement powers to federal bank regulators, including the OCC. See H.R. Rep. No. 101-54(I), at 464-66 (1989), reprinted in 1989-2 U.S.C.C.A.N. 86, 260-62; H.R. Conf. Rep. No. 101-222, at 393, 439-42 (1989), reprinted in 1989-2 U.S.C.C.A.N. 432, 478-81. Of particular relevance to the OCC actions of which SNB complains, FIRREA imposed more stringent capital requirements on commercial banks, see 12 U.S.C. § 1464; expanded the grounds on which the Comptroller may place a national bank in conservatorship or receivership, see 12 U.S.C. §§ 203(a), 1813(x), 1821(c)(5); and prohibited judicial actions "to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver," 12 U.S.C. § 1821(j). See Hindes v. FDIC, 137 F.3d 148, 160-61 (3d Cir. 1998).

We conclude that this comprehensive statutory regime precludes the Bivens damage claims asserted by SNB. All the adverse regulatory actions at issue fell within the OCC's express statutory powers to regulate national banks, to take action against unsafe and unsound banking practices, and to appoint a receiver for insolvent banks. The OCC actions up to the declaration of SNB's insolvency were subject to administrative and judicial review processes that SNB invoked. To the extent these APA remedies are limited, the long history of congressional regulation of national banks confirms that the limitations are not inadvertent. Rather, Congress has repeatedly adjusted, and at times overhauled, these statutory remedies in a continuing effort to resolve -

> a difficult and delicate problem of reconciling conflicting interests -- on one hand, the interests of depositors and savers who have their money in these insured institutions, the interests of well-run banks and savings and loan associations who contribute substantial premiums to the reserve funds of the insuring agencies, and the interests of the Government which underwrites the insuring agencies -- in preventing irresponsible or even criminal individuals from looting or otherwise wrecking insured banks and savings and loan associations through improper activities; on the other hand, the interests of insured banks and savings and loan associations and their officials in receiving fair treatment from the Government, and in receiving a reasonable degree of protection from Government actions which might at times, for one reason or another, degenerate into arbitrary, capricious, and overbearing tactics.

S. Rep. No. 1482, 1966-3 U.S.C.C.A.N. at 3534-35. In this complex regulatory environment, it is for Congress to decide whether the public interest in a sound national banking system would be furthered by a cause of action requiring bank regulators to pay damages personally unless they can convince a jury that their conduct in aggressively regulating a national bank was not the product of an unconstitutional motive. Because Congress has not created that cause of action, we decline to extend Bivens so as to create it by implication, just as many circuits have

declined to permit <u>Bivens</u> damage actions against agents of the Internal Revenue Service, who administer another comprehensive federal regulatory regime in which relationships between the regulator and the regulated are frequently hostile and adversarial. <u>See</u> <u>Vennes v. An Unknown Number of Unidentified Agents</u>, 26 F.3d 1448, 1453 (8th Cir. 1994); <u>Schreiber v. Mastrogiovanni</u>, 214 F.3d 148, 150-55 (3d Cir. 2000), and cases cited.

<u>SNB's § 1981 and § 1982 Claims.</u> These civil rights statutes grant causes of action to persons who, on account of race, are denied the right to make and perform contracts (§ 1981) or to buy, hold, and sell property (§ 1982). <u>See, e.g.</u>, <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273, 295-96 (1976); <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229, 236 (1969). The amended complaint alleges that defendants, on account of race, took regulatory actions "to deny creditworthy, non-white and minority borrowers and potential borrowers of loans purchased or financed by Plaintiff Sinclair," thereby depriving those persons of their "equal right to make and enter into contracts with qualified buyers to buy, own and sell real property on account of Plaintiffs' association with persons who are non-white."

SNB did not lend directly to non-white borrowers. Rather, SNB purchased large pools of non-prime loans from a company owned or formerly owned by Mr. Sinclair. The FDIC criticized SNB's high-risk business plan, the OCC demanded increased equity capital to protect the bank's insured depositors, and ultimately the OCC placed SNB in receivership as insolvent. In response to defendants' motion to dismiss in the district court, plaintiffs cited no case imposing § 1981 or § 1982 liability on federal regulators for regulatory actions taken within their statutory authority. Here, it is not enough for SNB to allege and prove that the pools of non-prime loans included a disproportionate number of loans to non-white borrowers. "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact." <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264-65 (1977). In these circumstances, we doubt that SNB has

-13-

stated a claim under § 1981 or § 1982, but in any event it is clear that defendants are entitled to qualified immunity from these damage claims. See Anderson v. Creighton, 483 U.S. 635, 640 (1987).

### III. The RICO Claims.

"The major purpose behind RICO is to curb the infiltration of legitimate business organizations by racketeers." Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 990 (8th Cir. 1989). To establish a RICO violation, a plaintiff must allege and prove "(1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4) defendant's actions constitute a pattern of racketeering activity." United Healthcare Corp. v. Amer. Trade Ins. Co., 88 F.3d 563, 570 (8th Cir. 1996). In his lengthy response to defendants' motion to dismiss in the district court, Mr. Sinclair asserted that the nine defendants, all employees of the OCC, functioned as an enterprise and that their above-described conduct in regulating SNB constituted a pattern of racketeering activity intended to "persecute national banks that seek to make minority lending a primary focus of their activities and force these institutions out of business." Mr. Sinclair has cited no authority for the proposition that federal employees who take regulatory action consistent with their statutory powers engage in a "pattern of racketeering activity" if those actions are adverse to a particular industry or business activity. In our view, the proposition is ludicrous on its face. "Bankers do not become racketeers by acting like bankers." Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 981 (8th Cir. 1991). Likewise, bank regulators do not become racketeers by acting like aggressive regulators.

### IV. Conclusion.

For the foregoing reasons, we conclude that the amended complaint fails to state a claim upon which relief can be granted. Therefore, we need not consider

whether defendants are entitled to absolute immunity from any or all of the claims asserted by Mr. Sinclair and SNB. See generally Butz v. Economou, 438 U.S. 478 (1978); compare Howard v. Suskie, 26 F.3d 84 (8th Cir. 1994), with Kwoun v. Southeast Mo. Prof. Standards Review Org., 811 F.2d 401, 405-06 (8th Cir. 1987). The judgment of the district court is affirmed. Appellant's Motion to Strike is denied as moot.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.